1999-NMSC-014

978 P.2d 967

**STATE of New Mexico, Plaintiff–Petitioner,**

v.

**Gordon HOUSE, Defendant–Respondent.**

**No. 24861.**

Supreme Court of New Mexico.

Feb. 24, 1999.

Rehearing Denied March 19, 1999.

**156**

Hon. Tom Udall, Attorney General, Steven S. Suttle, Assistant Attorney General, Santa Fe, for Petitioner.

Friedman & Henderson, L.L.P., William J. Friedman, IV, Santa Fe, Ray Twohig, Albuquerque, for Respondent.

*OPINION*

FRANCHINI, Justice.

{1} Gordon House was convicted of vehicular homicide and various other charges after two hung juries in Taos County and a change of venue to Doña Ana County for the third trial. The Court of Appeals reversed his conviction, holding that the trial court abused its discretion in changing the venue from Taos County to Doña Ana County. The State appealed. We hold that the trial court did not abuse its discretion in concluding that a fair trial could not be guaranteed in Taos County and that Doña Ana County was more likely to be free from exception. We reverse the Court of Appeals and affirm the trial court.

## I. FACTS

{2} This case, arising from a fatal traffic accident, was so transformed by publicity that all those involved were compelled to evaluate how the defendant could receive a fair trial. So frenetic was the media attention that the prosecution eventually claimed that even the State was having difficulty receiving a fair adjudication of this case.

{3} On Christmas Day 1992, the citizens of New Mexico awoke to news reports concerning a tragic traffic accident that had occurred the night before.[1] Through the constant media coverage, the details of the accident were widely available. The following facts were adduced from the record of the proceedings in the trial court. The incidental endnotes are intended to illustrate the extent and nature of the media coverage surrounding each event in this case.

{4} On that Christmas eve, Paul Cravens, his wife Melanie, and her three daughters, five-year-old Kaycee, seven-year-old Erin, and nine-year-old Kandyce, set off in their Oldsmobile to enjoy the Christmas Lights in Albuquerque. They drove westward on Interstate Highway 40 toward "Nine Mile Hill" which provided a vantage from which they could see the city's lights.[2]

{5} Gordon House, an enrolled member of the Navajo nation, is married and the father of two young children, and was employed as executive director of House of Hope, a halfway home for troubled adolescents in Gallup, New Mexico.[3] That Christmas Eve, he was driving his Ford pickup from Albuquerque to his home in Thoreau, New Mexico. House admitted that, during that evening, over a period of several hours, he had consumed seven-and-one-half beers.[4]

House claimed that, shortly after beginning his journey, he became ill with the precursor symptoms of a migraine headache.[5] He asserted that his migraine symptoms grew so severe that he was partially blinded.[6] He became disoriented and inadvertently entered Interstate Highway 40 going the wrong direction. Thus, at the same time Cravens and his family were driving west in the westbound lane, House was driving east in the same lane.

{6} Several other vehicles were forced to take evasive actions to avoid colliding with House as he drove eastward in the westbound lane of the Interstate.[7] A state policeman paced House from the proper eastbound lane, attempting to get his attention with red lights, a siren, and a spotlight directed at House's truck. At one point House looked at the policeman and accelerated to speeds exceeding 85 miles per hour.[8] House hit the Cravens' car head-on. Melanie Cravens and her three young daughters were killed instantly. Paul Cravens suffered severe injures.

{7} House was seriously injured. The prosecution offered evidence that, shortly after House arrived at a hospital in Albuquerque, his blood-alcohol concentration was measured at .18% and, about five hours later, was measured at .10%.[9] House asserted that a severe familial hemiplegic migraine, rather than alcohol, was the proximate cause of his driving the wrong way on the freeway and the resultant accident.[10] It was later revealed that he had a single prior conviction of driving while intoxicated from magistrate court in McKinley County, New Mexico, in December 1987.[11]

{8} The accident and all its consequences became one of the most widely publicized cases in New Mexico history. Within days of the accident, newspapers reported that many members of the public reacted with outrage and demanded tougher DWI laws.[12] The accident, and the defendant himself, became figureheads for those who were urging more

punitive DWI laws in New Mexico.[13] Statements by members of the victims' families were frequently reported by the media.[14] Nadine Milford, Melanie Craven's mother, was the subject of a feature on national television.[15]

{9} House's family, members of the Navajo nation, and others publicly decried the news coverage and prosecutorial tactics as racist and one sided.[16] The advocacy of attorneys for both the prosecution and the defense made for colorful reportage.[17]

{10} Editorialists heatedly expostulated about the case.[18] Newspaper readers frequently expressed their opinions in letters to the editor.[19] Talk show listeners expressed their feelings.[20] Human interest portraits were published about almost anyone who had any relationship with any of the people involved in the accident.[21] The evening TV news and front-page news stories covered even minor developments in the case.[22] As reported by the news media, the court, on more than one occasion, felt compelled to issue gag orders to the parties in the case, forbidding them from making statements to the news media.[23] Even these orders provoked litigation which itself became newsworthy.[24] Inevitably, the media coverage itself became an inextricable part of the story.[25]

{11} The Criminal Complaint was filed on July 13, 1993. In addition to charges of vehicular homicide, great bodily injury by vehicle, driving while intoxicated, reckless driving, and eluding an officer, the prosecution brought charges of first-degree depraved-mind murder. On September 22, 1993, House submitted to this Court a Verified Petition for Extraordinary Writ, asking that we order the State to proceed no further in the first-degree-murder prosecution. We denied the writ.[26] The trial court held a preliminary hearing on the matter.[27] Upon hearing the evidence, Honorable Frank H. Allen Jr. dismissed the depraved-mind-murder charges on October 27, 1993. Public reactions of outrage and relief were duly reported.[28]

{12} Both the prosecution and the defense became concerned that House could not receive a fair trial in Bernalillo County because of the extensive pretrial publicity. House made a motion, unopposed by the State, for a venue change. On March 23, 1994, Judge Allen changed the venue of the trial to Taos County.[29]

{13} Amid extensive print and broadcast coverage, the first of the Taos trials began on June 6, 1994.[30] On June 21, 1994, the jury convicted House on the misdemeanor charge of driving while intoxicated but declared that it was deadlocked nine to three in favor of conviction on all the remaining counts including the vehicular homicide counts. News of the hung jury incited a furious round of media attention.[31] The court entered an Order declaring a mistrial on the remaining six counts on June 28, 1994.

{14} The prosecution made a public avowal to seek a retrial and, on July 29, 1994, filed a Motion for Change of Venue in which the District Attorney stated that it was impossible for the State to receive a fair trial in Taos County. This motion was opposed by House.[32] The motion to change venue was denied on August 23, 1994. *State v. House,* CR–93–1693, slip op. (N.M.Dist.Ct. Aug. 23, 1994) (Findings of Facts and Conclusions of Law re: States [sic] Motion to Change Venue.)[33] A few days later Judge Allen recused himself from the case, and the Honorable Richard Blackhurst was assigned to the case.

{15} A second jury trial began in Taos County on November 7, 1994.[34] Once again the jury announced that it was deadlocked nine to three in favor of conviction on the vehicular homicide counts. Journalists attempted to explain the non-verdict and recorded the reactions of the participants and the public.[35] An order declaring mistrial was entered on November 30, 1994.

{16} The prosecution proclaimed its intention to seek a third trial. A newspaper article reported the reaction of a State Senator from Taos accusing the prosecutor of being obsessed with the case.[36] Arguing that, because of extensive and pervasive pre-trial publicity, it could no longer receive a fair trial in Taos, the prosecution, on November 30, 1994, moved for change of venue to Bernalillo County.

{17} In early December 1994, Judge Blackhurst recused himself due to his pending retirement and the case was eventually assigned to Honorable James F. Blackmer.

{18} House's attorney, on December 2, 1994, published an article accusing the district attorney of ignoring justice and being controlled by a "lust for vengeance" in seeking a third trial.[37] On December 16, 1994, in response to a motion by the prosecution,[38] Judge Blackmer issued a gag order prohibiting the attorneys in the case from making substantive comments about the case in the media. House's attorney sought a writ of superintending control to vacate the gag order.[39] In March 1995, at a hearing on the matter, we vacated the gag order.[40] We later filed a written opinion explaining that the gag order was an unconstitutional prior restraint of speech. *See Twohig v. Blackmer,* 1996–NMSC–023, ¶¶ 11–28, 121 N.M. 746, 918 P.2d 332. Shortly after we declared the first gag order unconstitutional, the trial court, on April 24, 1995, issued a second restriction on public statements about the trial. Once again House's attorney objected but the matter apparently was not litigated.

{19} A few days after the first gag order, on December 5, 1994, House filed a "Defendant's Motion to Dismiss Remaining Charges For Prosecutorial Misconduct Cruel & Unusual Punishment & Due Process." Arguments concerning the efficacy of a third trial were aired by the media.[41] On January 12, 1995, Judge Blackmer, after holding a hearing on the matter, denied House's motion to dismiss. After a hearing on the prosecution's motion to change venue, Judge Blackmer, on February 7, 1995, granted the motion; however, the new trial would not be held, as the prosecutors wished, in Bernalillo County.

{20} Two months later Judge Blackmer issued an "Order Changing Venue For Trial, and Order on Jury Selection in New Venue" which included an extensive analysis of the venue question. He concluded that a fair

trial could be held in Doña Ana County, in Southern New Mexico, and ordered that House's third trial be held at that venue. *See State v. House*, No. CR–93–1693, slip op. (N.M.Dist.Ct. Apr. 5, 1995) (Order Changing Venue For Trial, and Order on Jury Selection in New Venue) [hereinafter *Venue Order*]. House responded, on April 21, 1995, by filing a petition for Writ of Superintending Control to this Court, challenging the refusal of the district judge to dismiss the indictment after two hung juries, and challenging the change of venue to Doña Ana County. Five days later we denied the petition without prejudice. *House v. Blackmer*, No. 22,864 (N.M. Apr. 26, 1995) (Order denying Petition for Writ of Superintending Control and Request for Stay).[42]

{21} Shortly thereafter, on May 5, 1995, the third trial began in Doña Ana County. This time it was broadcast nationwide on Court TV.[43] The Doña Ana jury, on May 26, 1995, convicted House on all the charges that the Taos juries had been unable to resolve in the two preceding trials. They found him guilty of four counts of Homicide by Vehicle (Driving While Intoxicated), four counts of Homicide by Vehicle (Reckless Driving), one count of Great Bodily Injury by Vehicle (Driving While Intoxicated or in the alternative Reckless Driving), and Reckless Driving.[44] On July 24, 1995, before television cameras, Judge Blackmer sentenced House to 22 years in prison.[45]

{22} House filed an appeal of his convictions to the New Mexico Court of Appeals. House was denied bail pending appeal. He brought this matter before the Court of Appeals which reversed his denial of bail. *See State v. House*, 1996–NMCA–052, ¶ 42, 121 N.M. 784, 918 P.2d 370, *cert denied*, 121 N.M. 676, 916 P.2d 1343 (1996). On November 20, 1997, the Court of Appeals reversed House's convictions for vehicular homicide and held that there was no justification for a transfer of venue to Doña Ana County without first trying to select a jury in Taos County.[46] *See State v. House*, 1998–NMCA–018, ¶¶ 13–53, 124 N.M. 564, 953 P.2d 737 [hereinafter *House Majority*]. Judge Armijo filed a dis-

sent. *See State v. House*, 1998–NMCA–018, ¶¶ 72–118, 124 N.M. 564, 953 P.2d 737 (Armijo, J., dissenting) [hereinafter *House Dissent*].

{23} Both parties petitioned this Court for certiorari, and on January 14, 1998, we denied House's petition, *State v. House*, 124 N.M. 418, 952 P.2d 19 (1998), and granted the State's petition on the issue of venue, *State v. House*, 124 N.M. 418, 952 P.2d 19 (1998).[47] We held oral arguments on March 31, 1998.[48]

{24} To resolve the conflicting issues raised by the arguments of the parties, the trial court's *Venue Order*, and the opinions of the majority and dissent in the Court of Appeals opinion below, we must address both sides of the venue question argued in this case: the unsuitability of Taos County and the suitability of Doña Ana County as venues for House's trial.

{25} As mentioned above, these same issues were brought before us when, before the third trial, House filed a writ of Superintending Control to this Court on April 21, 1995, asking us to reverse the venue change. *See House v. Blackmer*, No. 22,864 (N.M. Apr. 26, 1995). We denied the petition five days after it was filed. Our denial of House's petition for a writ of superintending control does not preclude appellate review of the trial court's action and does not necessarily reflect upon the merits of House's contentions for purposes of this appeal. *See* Rule 12–504(C)(1) NMRA 1998 (providing that the Court may deny a petition without hearing if it "is without merit, concerns a matter more properly reviewable by appeal, or seeks relief prematurely"); *State v. Ware*, 115 N.M. 339, 343, 850 P.2d 1042, 1046 (Ct.App.1993) ("The denial of a writ of prohibition does not necessarily mean that the Supreme Court reached the merits of the issue argued in support of the writ, especially where there exists an adequate remedy at law."). We nevertheless conclude in this appeal that the trial court did not abuse its discretion in changing venue from Taos County to Doña Ana County. We reverse the Court of Appeals and affirm the trial court.

## II. RELEVANT CONSTITUTIONAL AND STATUTORY PROVISIONS

{26} All decisions regarding the venue of a criminal trial are guided by the constitutional guarantee of a fair and impartial trial. *See* N.M. Const. art. II, § 14 (as amended 1980) (guaranteeing "an impartial jury"); N.M. Const. art. II, § 18 (as amended 1972) (due process and equal protection). To that end, our constitution states that the accused is entitled to a trial before "an impartial jury of the county or district in which the offense is alleged to have been committed." N.M. Const. art. II, § 14. Many years ago, we concluded that this entitlement "has a double aspect. The trial must not only be in the county, but it must also be an impartial jury. If the latter element is not present, the constitutional guaranty no longer controls." *State v. Archer*, 32 N.M. 319, 323, 255 P. 396, 398 (1927).

{27} The first aspect—the right to be tried where the crime occurred—serves to prevent "the unfairness and hardship involved when an accused is prosecuted in a remote place." *United States v. Cores*, 356 U.S. 405, 407, 78 S.Ct. 875, 2 L.Ed.2d 873 (1958). It is presumed the defendant would desire to be tried where witnesses and evidence are likely to be accessible, "and where he might have the benefit of his good character if he had established one there." *State v. Holloway*, 19 N.M. 528, 537, 146 P. 1066, 1068 (1914); *see also* NMSA 1978, § 30–1–14 (1963) ("All trials of crime shall be had in the county in which they were committed."). We adopt the terms "vicinage" and "constitutional vicinage" when referring to the constitutionally presumptive venue. The word "vicinage" traditionally designates a neighborhood or local community and does not necessarily connote an entire county or judicial district that delineates a typical venue. *See* Black's Law Dictionary 1567 (6th ed.1990); *see also State v. Johnson*, 104 N.M. 430, 432, 722 P.2d 681, 683 (Ct.App. 1986) ("[T]he Court held that a juror sitting in obscenity cases may draw on his knowledge of the community or vicinage from which he comes to determine what 'the aver-

age person, applying contemporary community standards' would conclude.") (quoting *Hamling v. United States*, 418 U.S. 87, 105, 94 S.Ct. 2887, 41 L.Ed.2d 590 (1974)). However, this word has been used by many courts as a term of art signifying the venue in which the offense occurred and to which the defendant is constitutionally entitled. *See, e.g., People v. Gbadebo–Soda*, 38 Cal. App.4th 160, 45 Cal.Rptr.2d 40, 45 (Cal.App. 1995) ("Venue and vicinage are logically distinct concepts; venue refers to the location where the trial is held, while vicinage refers to the right of a criminal defendant to be tried by a jury drawn from the area in which the crime occurred."); *Woosley v. Commonwealth*, 293 S.W.2d 625, 626 (Ky.1956) ("Vicinage . . . means that the original venue is in the county in which the offense charged, or part of it, was committed.").

{28} In those circumstances when the second aspect—the right to an impartial jury—cannot be guaranteed, the site of the trial "shall be changed, upon motion," from this constitutional vicinage

to some county free from exception:

. . . .

(2) when the party moving for a change files in the case an affidavit of himself, his agent or attorney, that he believes he cannot obtain a fair trial in the county in which the case is pending because:

(a) the adverse party has undue influence over the minds of the inhabitants of the county; or

(b) the inhabitants of the county are prejudiced against the party; or

(c) because of public excitement or local prejudice in the county in regard to the case or the questions involved therein, an impartial jury cannot be obtained in the county to try the case; or

(d) any other cause stated in the affidavit.

NMSA 1978, § 38–3–3(A) (1965). By referring to the movant as an unspecified "party," this statute grants to both the defendant and the State the right to seek a change of venue. *See Holloway*, 19 N.M. at 541, 146 P. at 1069

("[C]ommencing with 1851, down to the present, there had prevailed a consistent legislative policy favoring changes of venue to both sides in criminal cases."); *Archer*, 32 N.M. at 323–24, 255 P. at 398 (discussing State's interest in moving for venue change). This is because, depending upon the venue, both sides are susceptible to prejudice and both sides are equally entitled to a fair trial under the venue statute, though a criminal defendant's statutory right to a fair trial is guided by the constitutional right to an impartial jury in the county in which the crime allegedly occurred. *See Holloway*, 19 N.M. at 536–37, 146 P. at 1068 (explaining that the State has a right to a venue change in order to secure a fair trial "assuming that statutory authority for a change of venue exists").

{29} In a case in which there have been no preceding changes of venue, this right to a venue change is generally mandatory and must be granted by the trial court, provided that the moving party has filed an affidavit as prescribed by Section 38–3–3(A)(2). *See State v. Turner*, 90 N.M. 79, 81, 559 P.2d 1206, 1208 (Ct.App.1976). However, "[u]pon the filing of a motion for change of venue, the court may require evidence in support thereof, and upon hearing thereon shall make findings and either grant or overrule said motion." NMSA 1978, § 38–3–5 (1929). Thus, upon the need for an evidentiary hearing, this first change of venue ceases to be mandatory and is left to the court's discretion. *Turner*, 90 N.M. at 81, 559 P.2d at 1208. As discussed below, an evidentiary hearing would be required when the State, against the defendant's objections, seeks to move the trial from the constitutional vicinage. In addition to these procedures, a venue change may be ordered by the trial court "if both parties stipulate in writing to that change." NMSA 1978, § 38–3–4 (1961). In the case at bar, House made a motion for a venue change which the State did not oppose.

{30} Should either party conclude that a fair trial may be impossible after the first venue change, "[a] second change of venue shall not be allowed in any civil or criminal case, as a matter of right, but shall be within the discretion of the court." NMSA 1978, § 38–3–6 (1880). The State's motion to change venue for the second time in this case was therefore within the trial court's discretion.

## III. STANDARD OF REVIEW

### A. The Proper Standard of Review

{31} Under our venue statutes, those changes of venue that are not mandatory take place at the discretion of the trial court. *See* § 38–3–3(A) (mandatory upon proper motion unless evidentiary hearing under Section 38–3–5); § 38–3–6 (second venue change at court's discretion). The trial court's discretion in this matter is broad and will not be disturbed on appeal unless a clear abuse of that discretion can be demonstrated. *State v. Hargrove*, 108 N.M. 233, 239, 771 P.2d 166, 172 (1989). The burden of establishing an abuse of discretion is borne by the party that opposes the trial court's venue decision. *Id.* In this case, House bears that burden. We will affirm a determination of venue if we are convinced that the trial court, in exercising its discretion, was "guided by law, caution, and prudence." *State v. Alaniz*, 55 N.M. 312, 318, 232 P.2d 982, 985 (1951).

{32} The standard of review required in assessing most abuse-of-discretion claims is whether the trial court's venue determination is supported by substantial evidence in the record. *See State v. Atwood*, 83 N.M. 416, 417, 492 P.2d 1279, 1280 (Ct.App. 1971).

Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion, and has been defined as evidence of substance which establishes facts from which reasonable inferences may be drawn. On appeal, all disputed facts are resolved in favor of the successful party, all reasonable inferences indulged in support of the verdict, all evidence and inferences to the contrary disregarded, and the evidence viewed in the aspect most favorable to the verdict. Nor does the fact that there may have been contrary evidence which would have supported a different verdict permit us to weigh the evidence.

*Tapia v. Panhandle Steel Erectors Co.,* 78 N.M. 86, 89, 428 P.2d 625, 628 (1967) (citations omitted). Thus, in this case we evaluate, on the basis of substantial evidence, whether the trial court reasonably concluded that neither the State nor House could receive a fair trial in Taos County and that both parties could receive a fair trial in Doña Ana County.

{33} We must be mindful that it is the role of the trial court, and not the appellate court, to weigh the evidence and determine the credibility of witnesses. *See McCauley v. Ray,* 80 N.M. 171, 176, 453 P.2d 192, 197 (1968). We will not substitute our own judgment for a determination of the trial court that is supported by substantial evidence in the record. *See State v. Griffin,* 117 N.M. 745, 750, 877 P.2d 551, 556 (1994) (quoting *State v. Taylor,* 60 Wash.2d 32, 371 P.2d 617, 621 (1962)).

{34} Another important factor that would prove abuse of discretion in a venue determination is a showing by the complainant that he or she has been prejudiced by the trial court's decision. Substantial evidence that a trial in a particular venue was not fair and impartial would require reversal on appeal. *See State v. Griffin,* 116 N.M. 689, 698, 866 P.2d 1156, 1165 (1993) ("Because [the defendant] has failed to show or even allege specifically that he was prejudiced by the court's actions, we find no abuse of discretion.").

## B. House's Proposed Standards of Review

### 1. De novo

{35} In contravention of these principles of review, House argues that decisions under our venue statutes are mixed question of law and fact and that we should review under a de novo analysis rather than an abuse-of-discretion analysis. *See State v. Attaway,* 117 N.M. 141, 145–46, 870 P.2d 103, 107–08 (1994). In other words, he asks us not to defer to the trial court's appraisal of the evidence, but rather to look anew at all the evidence and arguments in the record and apply our own judgment in weighing the facts and assessing their legal significance.

*See McNair v. Lend Lease Trucks, Inc.,* 62 F.3d 651, 654 (4th Cir.1995) (evidentiary assessment); *Slaughter v. Martin,* 9 Ala.App. 285, 63 So. 689, 690 (1913) (judgment). Most certainly, we address no question that is purely factual or purely legal; all questions are, to varying degrees, a combination of the two. However, in the case of a venue determination, the question is primarily one of fact. While the legal concept of a fair and impartial trial is a standard against which we measure the trial court's decision, it is a standard that makes sense only with reference to the specific facts concerning the fairness and impartiality of a particular venue. Whether or not a fair impartial trial is possible in a particular venue is established by substantial evidence—a factual standard— and this evidence forms the basis upon which we affirm or reverse a trial court's exercise of discretion in setting venue. *See Ammerman v. Hubbard Broadcasting, Inc.,* 89 N.M. 307, 313, 551 P.2d 1354, 1360 (1976) ("Our review of the evidence is only for the purpose of determining whether there was substantial evidence to support the trier of the facts.").

### 2. Heightened scrutiny

{36} Because the choice of venue is founded on the constitutional guarantee of a fair and impartial trial, House also argues that we should apply a heightened standard of proof in assessing the trial court's venue decision. It seems that House is asking us to evaluate the trial court's venue determination using the traditional "heightened," or "intermediate," as it is sometimes called, constitutional standard of scrutiny. *See, e.g., Trujillo v. City of Albuquerque,* 1998– NMSC–031, ¶ 15, 125 N.M. 721, 965 P.2d 305 (defining "intermediate scrutiny"). As we explain below, in most circumstances, the movant must demonstrate no more than a reasonable probability that a fair and impartial trial is unlikely in a particular venue. No New Mexico authority suggests that, in reviewing a change of venue, we should renounce a reasonable probability standard for a more rigorous constitutional analysis. Furthermore, as we explain below, the standards for assessing the constitutionality of a venue—which consists of an entire geographical region—are far different from the constitu-

tional standards for the venire and the petit jury consisting of small groups of people who are actually present at the trial of the accused. A change of venue caused by pretrial publicity simply does not invoke the same constitutional urgency regarding the location of a trial and the composition of a jury as do other questions, such as the purposeful exclusion of a particular race from the jury pool. *Mu'Min v. Virginia*, 500 U.S. 415, 426–27, 111 S.Ct. 1899, 114 L.Ed.2d 493 (1991) (stating questions about racial prejudice in voir dire are essential while questions about pretrial publicity are not necessarily so).

{37} Nevertheless, House insists that this Court has expressly renounced the reasonable probability analysis for a "clear and present danger" test in determining whether pretrial publicity has deprived a defendant of a fair trial. For support he takes out of context a somewhat ambiguous passage in *Twohig v. Blackmer*, the offshoot of this case in which House's attorney challenged the constitutionality of Judge Blackmer's first gag order. House seizes upon the statement from *Twohig* that

> the *inquiry* is the same regardless of whether a court is analyzing the constitutionality of a gag order, considering the propriety of disciplinary action, or *determining whether pretrial publicity was so pervasive as to deprive a criminal defendant of a fair trial.*

*Twohig*, 1996–NMSC–023, ¶ 16, 121 N.M. 746, 918 P.2d 332 (citations omitted, emphasis added). This sentence appears in a paragraph which mentions alternative tests or standards of review "for permissible restrictions on attorney speech," including the "clear and present danger" test. However, the "inquiry" being discussed in this passage is not a particular standard of review. Rather, the "inquiry" is the process in which a court balances the "danger" and "evil" that could result from a "particular utterance" against the "need for free and unfettered expression." *Id.* (quoting *Gentile v. State Bar*, 501 U.S. 1030, 1036, 111 S.Ct. 2720, 115 L.Ed.2d 888 (1991) (quoting *Landmark Communications, Inc. v. Virginia*, 435 U.S. 829, 843, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978))).

This statement merely notes that, in all three circumstances mentioned, courts will attempt to find the balance between harmful speech and freedom of speech. The dissent below has offered a similar analysis of these words. *See House Dissent*, 1998–NMCA–018, n. 1, 124 N.M. 564, 953 P.2d 737. This passage does not in any way intimate that we should renounce our longstanding application of the abuse-of-discretion analysis in evaluating a venue change. It is certainly no endorsement of the "clear and present danger" test which has rarely, if ever, been stretched beyond First Amendment speech issues to include the appraisal of venue determinations. *See generally* Ernest H. Schopler, Annotation, *Supreme Court's development of the "clear and present danger" rule and the related rule concerning advocacy of unlawful acts as limitations on the constitutional right of free speech and press*, 38 L.Ed.2d 835 (1974).

{38} House further confounds the standards of proof for restraints of speech with those for venue changes when he emphasizes that in *Twohig* we concluded that the gag order placed upon the parties in this case was an unconstitutional prior restraint because there was "a complete lack of factual findings to support the conclusion that such an order was necessary to preserve the parties' right to a fair trial." *Twohig*, 1996–NMSC–023, ¶ 28, 121 N.M. 746, 918 P.2d 332. In contrast, the exact same evidence of pretrial publicity that was found non-prejudicial in a free-speech analysis was found by the trial court to be prejudicial in a venue analysis. House calls this conflicting use of identical evidence astonishing. The majority below noted this seeming anomaly. *See House Majority*, 1998–NMCA–018, ¶¶ 35–36, 124 N.M. 564, 953 P.2d 737. This is not anomalous. Unlike the rigorous constitutional test that must be satisfied in order to impose a prior restraint of speech, we do not—except, as discussed below, in one circumstance immaterial to this discussion—require more than a reasonable probability that a fair trial cannot be obtained in a particular venue. *See Deats v. State*, 80 N.M. 77, 79, 451 P.2d 981, 984 (1969); *Alaniz*, 55 N.M. at 318–19, 232 P.2d at 986. The standard of proof in

*Twohig* has no application to this case. Evidence that does not justify prior restraint of speech can, without contradiction, support a change of venue.

### 3. Heavier burden for the State

{39} The majority in the case below caused some controversy with its statement that "when the state does elect to move for a change of venue it carries a heavy burden to show that public sentiment is such that a fair and impartial trial is improbable." *House Majority*, 1998–NMCA–018, ¶ 21, 124 N.M. 564, 953 P.2d 737. The majority explained that this "heavy burden" is a product of the State's unique position as an opposing party that must nevertheless "insure that the defendant receives a fair trial." *Id.* ¶ 21, 232 P.2d 982. Citing our early venue cases *State v. Archer*, 32 N.M. at 323, 255 P. at 398, and *State v. Holloway*, 19 N.M. at 546–47, 146 P. at 1071–72, the majority noted that "the State must demonstrate . . . a high degree of prejudice against Defendant before it can successfully move to change venue for Defendant's benefit and against his wishes." *House Majority* 1998–NMCA–018, ¶ 30, 124 N.M. 564, 953 P.2d 737. House has introduced similar arguments.

{40} In this context, the majority was concerned by the State's arguments that it could not receive a fair trial in Taos while House claimed he suffered no prejudice in that venue. The majority emphasized that because the State sought a venue change over the adamant objections of the defendant, it must show strong proof to support its claim that Taos was not an impartial venue. *Id.* ¶¶ 22–23. The majority warned that the courts "should guard against an abuse of the state's power when the state moves for a change of venue," implicitly evoking the almost limitless resources and power of the State to pursue prosecution that, if abused, few defendants could hope to combat. *Id.* ¶ 21.

{41} The majority has not precisely characterized the State's burden. In most circumstances, the movant must demonstrate *a reasonable probability* that a fair and impartial trial is unlikely in a particular venue. *See Deats*, 80 N.M. at 79, 451 P.2d at 984 (stating that evidence supporting a venue-change motion "must be persuasive of the *probability* that a fair trial cannot be obtained in the county where the cause is pending" (emphasis added)); *Alaniz*, 55 N.M. at 318–19, 232 P.2d at 986 ("[I]t is sufficient to show a *reasonable apprehension* that the defendant will not secure a fair and impartial trial or that the jury are under an influence inimical to the accused." (emphasis added)); *People v. Proctor*, 4 Cal.4th 499, 15 Cal. Rptr.2d 340, 842 P.2d 1100, 1113 (1992) ("[The] defendant failed to carry his burden of proving there was a *reasonable likelihood* that jurors drawn from Shasta County would have formed such fixed opinions as a result of the pretrial publicity that they could not make the required determinations with impartiality." (emphasis added)).

{42} However, when the State moves for a change of venue over the defendant's objections, the nature of the State's burden depends upon whether the venue from which it seeks a change is the constitutional vicinage in which the crime allegedly occurred. The constitutional right to a trial in the "district in which the offense is alleged to have been committed" rests solely with the accused. *See* N.M. Const. art. II, § 14. The State has no equivalent constitutional right. Thus, when the State, against the defendant's objections, exercises its statutory right under Section 38–3–3 to move the trial from this constitutional vicinage, it must demonstrate why the defendant's constitutional right should be overridden. Under these circumstances the State bears a greater burden of proof than that applicable to other venue motions. *Ashley v. State*, 72 Fla. 137, 72 So. 647, 648 (1916) ("Where an application in a criminal prosecution for a change of venue from the county where the crime was committed is made by the prosecuting attorney, and the accused objects thereto, the matter should be tested in some way so as to make it to clearly appear that it is practically impossible to obtain an impartial jury to try the accused in that county."). The State bears a greater burden than mere probability when the vicinage is involved. *See Commonwealth v. Reilly*, 324 Pa. 558, 188 A. 574, 580 (1936) ("[T]he prosecution's

request for a change [from the constitutional vicinage] should be much more strictly scrutinized than one by the accused; before the court is moved to act, there should be the most imperative grounds."); *State v. Manning*, 329 S.C. 1, 495 S.E.2d 191, 195 (1997) ("[B]ecause a defendant's right to be tried in the county where the alleged offense occurred is defeated when the prosecution's request for a change of venue is granted, a court should exercise great care and deliberation when changing venue at the request of the prosecution, and the state's motion and evidence supporting its motion should be strictly scrutinized to ensure the defendant's right is not abused.").

{43} We conclude that, when moving, over the defendant's objections, for a change of venue from the district in which the crime allegedly occurred, the prosecution must prove with *clear and convincing evidence* that a fair trial in that district is a practical impossibility. *Cf. Higginbotham v. State*, 88 Fla. 26, 101 So. ·233, 239 (1924) ("[A]ny attempt to deprive the accused of his right to be tried in the county where the crime was committed, except where it is practically impossible to procure an impartial jury, and this practical impracticability is established by an actual test ... is in violation of the Constitution."); *Ashley*, 72 So. at 649 ("[W]hen upon a counter showing it does not clearly and affirmatively appear that an impartial jury to try the accused cannot be obtained in the county where the crime is alleged to have been committed, the application to change the venue should be denied .").

> [C]lear and convincing evidence is something stronger than a mere "preponderance" and yet something less than "beyond a reasonable doubt." For evidence to be clear and convincing, it must instantly tilt the scales in the affirmative when weighed against the evidence in opposition and the fact finder's mind is left with an abiding conviction that the evidence is true.

*In re Sedillo*, 84 N.M. 10, 12, 498 P.2d 1353, 1355 (1972) (citation omitted, quoting *In re Palmer*, 72 N.M. 305, 308, 383 P.2d 264, 267 (1963)).

{44} Though House argues otherwise, these principles do not apply to this case. As we discuss in detail below, Bernalillo County is the constitutional vicinage in this case. With his motion to change venue before the first trial, House waived his constitutional right to be tried in that venue. *See State v. Nichols*, 877 S.W.2d 722, 728 (Tenn. 1994) ("We conclude that the change of venue motion constitutes a waiver of [the defendant's constitutional vicinage] rights."). There is no constitutional basis for House to demand a trial in Taos County. *See State v. Bangert*, 131 Wis.2d 246, 389 N.W.2d 12, 35 (1986) (stating that "the defendant waived [his constitutional vicinage] right when he requested a change of venue"). Section 38–3–6 provides that a second change of venue, whether requested by the defendant or the State, shall be in the trial court's discretion. This statute makes no requirement that the State meet a heavier burden of proof than a criminal defendant. Thus, before the third trial, the State needed to provide evidence demonstrating a reasonable probability that it could not obtain a fair and impartial trial in Taos County.

## IV. PROBABILITY OF FAIR TRIAL IN TAOS COUNTY

### A. Presumed Prejudice, Actual Prejudice, and the Reasonable Probability of Prejudice

{45} House argues that the trial court abused its discretion because it did not have sufficient evidence to support its decision to move the trial from Taos County. The applicable statute, Section 38–3–6, states that "[a] second change of venue shall not be allowed in any civil or criminal case, as a matter of right, but shall be within the discretion of the court." This statute controls our evaluation of the move to Doña Ana County. However, the exact nature of the trial court's discretion has not, with the exception of the Court of Appeals majority opinion below, been construed by our appellate courts. The majority below, in discussing this statute, noted that "the court's discretion should be guided by its obligation to ensure that the parties receive a fair trial from an unbiased, impartial jury" and, more dubiously, posited "that the

fact that venue has already been changed once can weigh against a second change of venue." *House Majority*, 1998–NMCA–018, ¶ 7, 124 N.M. 564, 953 P.2d 737. It is true that in *State v. Alaniz*, we stated that the trial court need only determine whether there is "a reasonable apprehension" that the party seeking a new venue "will not secure a fair and impartial trial." *Alaniz*, 55 N.M. at 318–19, 232 P.2d at 986. However, these words were not directed at the statute at issue in this case. They refer to Section 38–3–3, which deals only with a first-and not a second-change of venue. As the assessment of Section 38–3–6 in the majority opinion below indicates, there is some dispute as to whether the standards that apply to a first change of venue should also apply to a second.

{46} House seizes upon this ambiguity by raising the distinction between actual prejudice and presumed prejudice. These are concepts applied by federal courts. Actual prejudice requires a direct investigation into the attitudes of potential jurors. Under this inquiry, the court will conduct a voir dire of prospective jurors to establish whether there is such widespread and fixed prejudice within the jury pool that a fair trial in that venue would be impossible. *United States v. Bakker*, 925 F.2d 728, 732 (4th Cir.1991). Presumed prejudice, on the other hand, addresses the effect of publicity about a crime upon the entire community where the trial takes place. Under this inquiry, a change of venue should be granted if evidence shows that the community is so saturated with inflammatory publicity about the crime that it must be presumed that the trial proceedings are tainted. *United States v. Dischner*, 974 F.2d 1502, 1523 (9th Cir.1992), overruled implicitly on other grounds by *United States v. Morales*, 108 F.3d 1031, 1035 (9th Cir.1997). However, the same standard of review applies to the trial court's decision-a determination based upon substantial evidence in the record-whether a venue change is based upon presumed or actual prejudice. But *see Snell*

*v. Lockhart*, 14 F.3d 1289, 1294 (8th Cir.1994) ("A higher standard must be met when a petitioner seeks habeas relief on the basis of presumed prejudice."). Thus, actual prejudice is based upon direct evidence of bias in the minds of individual prospective jurors, while presumed prejudice makes inferences about the effect of publicity on the community as a whole.

{47} There was some skepticism in the Court of Appeals opinion below as to the applicability of the distinction between actual and presumed prejudice. *House Majority*, 1998–NMCA–018, ¶ 17, 124 N.M. 564, 953 P.2d 737; *House Dissent*, 1998–NMCA–018, ¶¶ 78–80, 124 N.M. 564, 953 P.2d 737. Nevertheless, though it depreciated this distinction, the majority below implicitly invoked an actual-prejudice standard by stating that there should have been an attempt to seat a jury in Taos before granting a venue change. *House Majority*, 1998–NMCA–018, ¶ 42, 124 N.M. 564, 953 P.2d 737 (stating "we believe it is vitally important that the district court make an attempt to select a new jury from Taos County before ordering a change of venue"). But *see id.* ¶ 118 (stating "this Court must determine whether the pretrial publicity in this case raised a *presumption of prejudice*" (emphasis added)). Conversely, the trial court concluded that the likelihood of prejudice in Taos County was so overwhelming that the probability of unfairness could be established without voir dire. As Judge Blackmer stated, the findings showed "*a strong probability* that if a THIRD trial of this case were to be held in Taos County, a fair trial (and a fair and impartial jury) cannot be obtained." *Venue Order*, slip op. at 6–7 (Finding of Fact 11) (emphasis added). House claims that the trial court abused its discretion by applying a presumed-prejudice standard when it should have, as indicated by the majority below, applied an actual-prejudice standard and held voir dire in Taos.

{48} Regarding the nature of the trial court's discretion under Section 38–3–6, we conclude that the parameters that apply to a first change of venue should also apply to a second. Thus the trial court, in following Section 38–3–6, should rely upon

the indicia found in Section 38–3–3(A)(2): "undue influence" by the adverse party "over the minds of the inhabitants of the county," "public excitement," "local prejudice," and "any other cause" showing that a fair trial cannot be obtained "in the county in which the case is pending." As indicated above, the trial court should apply a reasonable-probability standard of proof when balancing conflicting claims regarding the likelihood of a fair trial in a particular venue.

{49} We emphasize that our holding in this case is founded on the requirement set forth in Section 38–3–6. In other words, the venue issue before us turns on whether the trial court abused its discretion in ordering a second venue change to Doña Ana County. However, we do not believe that, by itself, a finding of a reasonable probability of unfairness in Taos brings us any closer to a resolution of the claims of the parties, the rationale of the trial court's Order Changing Venue For Trial, and the conflicting arguments of the majority and dissent in the opinion of the Court of Appeals. House's arguments cannot be so summarily dismissed. Because of the highly contentious evidence in the record, as well as the disparity of opinion among, not only the parties, but members of the judiciary, we must comprehensively analyze whether voir dire was essential to determining the reasonable probability of a fair trial in Taos. We conclude that differentiating actual and presumptive prejudice is useful in evaluating the parameters of Section 38–3–6. As discussed below, New Mexico's venue statutes require a different standard of proof than would be required in federal courts under the presumptive prejudice standard. Based upon New Mexico venue laws, we conclude, contrary to the arguments of House and the majority of the Court of Appeals, that the trial court's implicit finding of presumed prejudice in Taos County is supported by substantial evidence. *See House Majority,* 1998–NMCA–018, ¶ 26, 124 N.M. 564, 953 P.2d 737.

### B. Proof of Actual Prejudice Is Not Required

{50} House contends that the trial court should have permitted a venue change from Taos County only if actual prejudice had been established. He urges that, in this particular case, the only way the trial court could have established that the venue was hopelessly prejudiced was to attempt to seat a jury by conducting voir dire. Only if interviews with actual potential jurors revealed an extreme level of prejudice would a change of venue be justified.

{51} When courts address actual prejudice, the often quoted inquiry, from *Patton v. Yount,* 467 U.S. 1025, 1035, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984), is whether the jurors "had such fixed opinions that they could not judge impartially the guilt of the defendant." *See, e.g., State v.. Hernandez,* 115 N.M. 6, 21, 846 P.2d 312, 327 (1993). Given the state of modern communications, it is not only unnecessary, but realistically impossible to expect jurors to be totally ignorant of the facts and issues of a case. *Sheppard v. Maxwell,* 384 U.S. 333, 362, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) (discussing "the pervasiveness of modern communications"). Thus, we make a distinction "between mere familiarity with petitioner or his past and an actual predisposition against him." *Murphy v. Florida,* 421 U.S. 794, 800 n. 4, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975).

{52} Voir dire is one way of establishing the existence of fixed opinions in the minds of potential jurors. *See State v. Chamberlain,* 112 N.M. 723, 726, 819 P.2d 673, 676 (1991) ("The court determined through voir dire that the jurors, although they may have heard of the case, were not incapable of impartiality. More is not required."). In voir dire the court will determine whether prospective jurors will be able to reach a verdict based solely "on evidence received in open court, not from outside sources." *Sheppard,* 384 U.S. at 351, 86 S.Ct. 1507. Voir dire establishes actual prejudice by exposing "the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality." *Reynolds v. United States,* 98 U.S. 145, 157, 25 L.Ed. 244 (1878).

{53} In *Twohig* we noted that in his first two trials "the court, attorneys for the State, and attorneys for House had used another

tool to combat potential prejudice caused by pretrial publicity-extensive voir dire-which also was available for use in the third trial." *Twohig,* 1996–NMSC–023, ¶ 27, 121 N.M. 746, 918 P.2d 332. House interprets this dictum as a mandate that voir dire be conducted before a change of venue. However, this comment merely suggests that voir dire is one way of measuring prejudice caused by pretrial publicity in the jury selection process-especially with regard to statements by attorneys to the public media.

{54} While voir dire is essential in establishing actual prejudice, it is but one method by which the trial court may determine that, because of pretrial publicity, a fair trial is improbable in a particular venue. *Cf. State v. Montano,* 93 N.M. 436, 437, 601 P.2d 69, 70 (Ct.App.1979) ("The answers of prospective jurors to questions on voir dire was evidence to be considered in deciding the venue motions."). We therefore disagree with the majority below that the record does not support "the district court's decision to take the drastic step of changing venue without first attempting to select a new jury from Taos County." *House Majority,* 1998–NMCA–018, ¶ 25, 124 N.M. 564, 953 P.2d 737. We agree with the dissent's conclusion that

> the presence or absence of voir dire of a third venire [is not] the only determinative factor in deciding whether there were adequate grounds for a venue change, especially where the trial court had the benefit of a record replete with expert analysis of public opinion surveys, published statements of community sentiment, and voir dire conducted in prior mistrials.

*House Dissent,* 1998–NMCA–018, ¶ 87, 124 N.M. 564, 953 P.2d 737. When other types of evidence, like those discussed below, support a presumption that pretrial publicity has rendered a fair trial improbable, then the court, in its discretion, can change venue without conducting voir dire. *Cf. Rideau v. Louisiana,* 373 U.S. 723, 727, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) (concluding on appeal "without pausing to examine a particularized transcript of the *voir dire* examination of the members of the jury" due process required a

trial before a jury drawn from an unbiased community).

{55} In New Mexico there is no requirement in our constitution, statutes, or case law that a venue change should be supported by proof of actual prejudice through voir dire, even when the change is opposed by the defendant. As with all aspects of a venue change, the choice of waiting until after voir dire before granting a motion to change venue rests with the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion. *See State v. Robinson,* 94 N.M. 693, 696, 616 P.2d 406, 409 (1980) (finding no abuse of discretion in the court's decision to wait until after voir dire before determining if impartial jury could be selected but in no way intimating that such a process would be required).

{56} To summarize, courts will change a venue based upon actual prejudice if they find that the opinions of the community, as reflected by the opinions of prospective jurors in voir dire, are so fixed that, were the trial to be held in that community, the jurors would be unlikely to lay aside their preconceived notions and base their judgment exclusively on the evidence presented at trial. *See Irvin v. Dowd,* 366 U.S. 717, 722–23, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

### C. Presumption of Prejudice in Taos County

{57} The concept that a venue may be changed because of presumed prejudice is based upon the strong due-process principle that our system of law must endeavor "to prevent even the probability of unfairness." *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955). As the United States Supreme Court has noted, "justice must satisfy the appearance of justice." *Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 99 L.Ed. 11 (1954). Federal courts have reserved presumed prejudice only for the most extreme situations in which a change of venue is required in order to protect a criminal defendant's constitutional right to a fair trial. *See, e.g., Snell,* 14 F.3d at 1293. In extreme cases, media coverage

can so sensationalize a crime that legal proceedings will be transformed and the objective of a fair trial will be compromised. *Cf. Sheppard*, 384 U.S. at 356–57, 86 S.Ct. 1507. Our own venue statutes do not require so high a standard. As set forth above, under Section 38–3–6, the movant must demonstrate a reasonable probability that a fair trial cannot be obtained in a particular venue. In New Mexico, when we analyze the presumption that a particular venue was tainted by prejudicial publicity, we will rest our conclusions on the "reasonable probability" standard of proof, rather than limiting the presumption, as do federal courts in the constitutional arena, only to the most extreme situations. Nevertheless, the publicity must be demonstrably prejudicial in order to support a trial court's determination that an unfair trial is reasonably probable. That standard has been emphatically established in this case. The publicity in this case was, in fact, extreme, if not outrageous. As Judge Blackmer stated in his Order, "[B]ut for this heavy television coverage of the 12/24/92 tragedy and its aftermath and the comments of public officials about this case, there is a good likelihood that change of venue from Bernalillo County in March 1994 and thereafter would not have been necessary." *Venue Order*, slip op. at 10 (Finding of Fact 17).

{58} Prejudice may be established if a community is so saturated by a barrage of inflammatory and biased publicity, close to the beginning of legal proceedings, that the trial inevitably takes place in an atmosphere of intense public passion. *See Irvin*, 366 U.S. at 727–28, 81 S.Ct. 1639 (discussing publicity causing opinion of guilt to permeate minds of jurors); *Coleman v. Kemp*, 778 F.2d 1487, 1539–43 (11th Cir.1985) (concluding trial court's denial of motion to change venue was clearly erroneous given pervasive prejudicial pretrial publicity). Under such circumstances there is a reasonable probability that prospective jurors were exposed to the sensational publicity, as well as the emotional atmosphere in the community, and that many of them are strongly predisposed for or against one of the parties in the case. *See Dischner*, 974 F.2d at 1524 (discussing pub-

licity "that proclaimed the defendants' guilt in advance of the trial and precluded the jurors from independently evaluating the evidence").

{59} Courts that have investigated the presence of presumed prejudice in a particular venue have discussed several factors that indicate prejudice from pretrial publicity has evolved to such a degree that a fair trial is improbable. These factors establish the reasonable probability, under Section 38–3–6, that a fair trial could not be obtained in Taos.

### 1. Neutrality and timing of publicity

{60} As both sides in the opinion below noted, the mere fact that publicity is widespread and that many people are familiar with a case does not automatically lead to the presumption that a venue has been impermissibly tainted. *House Majority*, 1998–NMCA–018, ¶ 13, 124 N.M. 564, 953 P.2d 737; *House Dissent*, 1998–NMCA–018, ¶ 80;, 124 N.M. 564, 953 P.2d 737 *see also Chamberlain*, 112 N.M. at 726, 819 P.2d at 676. Much depends on the nature of the publicity. News articles and broadcasts, even if pervasive and frequent, will not be found prejudicial if they are fair, neutral, unemotional, "and generally limited to a recitation of established facts." *Snell*, 14 F.3d at 1294. Also relevant is whether the publicity, even if it was emotional and opinionated, occurred close to the time of the trial. If detrimental articles and broadcasts appeared months or years before the beginning of a trial, the probability of prejudice is significantly reduced. *See Patton*, 467 U.S. at 1034, 104 S.Ct. 2885 ("That time soothes and erases is a perfectly natural phenomenon, familiar to all."); *Murphy*, 421 U .S. at 802, 95 S.Ct. 2031 (last significant publicity was seven months before jury selection).

{61} As the news items cited in the fact section of this opinion demonstrate, the pretrial, during-trial, and post-trial publicity in this case could not be characterized as largely fair, neutral, unemotional, or objective. Publicity about the case appeared frequently throughout the geographical region that included Taos County. Moreover, as noted by Judge Armijo in her dissent, news items

were published concurrent with every legal maneuver and proceeding in the case:

> [T]his is not a case where publicity was minimal or had diminished over time.

> The trial court's review of the content of the newspaper articles and television broadcasts presented in the record revealed that the nature of the publicity was, in some instances, emotional, sensational, inflammatory, intrusive, and potentially misleading.

*House Dissent*, 1998–NMCA–018, ¶¶ 100–01, 124 N.M. 564, 953 P.2d 737. There is abundant evidence in the record to suggest that the publicity in this case was prejudicial. *See Irvin*, 366 U.S. at 725–26, 81 S.Ct. 1639 (discussing highlights of numerous news items and their permeation of the community and concluding prejudice was clear and convincing).

### 2. Television, radio, and newspaper publicity

 {62} The form in which the publicity is disseminated can also be a factor in determining whether prejudice can be presumed to have overrun a community. It is often asserted that television is the most potentially prejudicial means of publicizing information. The United States Supreme Court has stated, "The television camera is a powerful weapon. Intentionally or inadvertently it can destroy an accused and his case in the eyes of the public." *Estes v. Texas*, 381 U.S. 532, 549, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965). For this reason, Judge Blackmer in his Order properly stated that the images of the devastated vehicles at the crash site (which, as indicated by the endnotes to the facts above, appeared incessantly throughout the television coverage about the House case), the emotional interviews with the families of the victims and with House and his family, the public sniping by the attorneys, and the intense coverage of the two trials in Taos, "would be much more memorable and make more of an impression upon viewers than would the same comments through radio and newspapers." *Venue Order*, slip op. at 10–11 (Finding of Fact 17(A)). Judge Blackmer concluded that for the residents of Taos County, these television images and sounds were "the most potential and likely source of prejudice to potential jurors." *Id.* at 11–12 (Finding of Fact 17(A)); *see also House Dissent*, 1998–NMCA–018, ¶¶ 99–101, 124 N.M. 564, 953 P.2d 737 (discussing effect of television).

{63} House and the majority in the opinion below argue that such a conclusion is not supported by evidence in the record. However, the influence of television can be so potent that the United States Supreme Court has intimated that it is reasonable to presume that inflammatory information broadcast by television has introduced bias into a venue, even if it is not possible to link a particular trend in public opinion to specific televised news items. *See Estes*, 381 U.S. at 544, 85 S.Ct. 1628 ("Still one cannot put his finger on [television's] specific mischief and prove with particularity wherein [the accused] was prejudiced."). The unrelenting televised publicity contributed to tainting the impartiality of Taos as a venue for this case.

{64} Though the effect of television news coverage was arguably the most prejudicial, the trial court also correctly acknowledged the detrimental impact of newspaper coverage, which was frequently highly emotional. *See Venue Order*, slip op. at 13–14 (Finding of Fact 17(C)) (discussing numerous lengthy newspaper articles); *House Dissent*, 1998–NMCA–018, ¶¶ 99–101, 124 N.M. 564, 953 P.2d 737 (discussing prejudicial effect of newspaper coverage). The court also acknowledged the influence of opinionated radio broadcasts. *See Venue Order*, slip op. at 13 (Finding of Fact 17(B)); *House Dissent*, 1998–NMCA–018, ¶¶ 99–100, 124 N.M. 564, 953 P.2d 737 (discussing prejudicial effect of radio coverage).

### 3. Size and nature of the community

 {65} The size and nature of a community are factors that can promote or dissipate the probability of prejudice resulting from pretrial publicity. *See Mu'Min*, 500 U.S. at 429, 111 S.Ct. 1899 (suggesting that a much publicized murder trial would not stand out in "the metropolitan Washington statistical area, which has a population of over 3 million, and in which, unfortunately, hundreds of murders are committed each year").

Taos County, according to the 1990 census, had little more than 23,000 residents. Judge Blackmer stated that the residents of this small community were very aware of the two trials in this case: "[The first] trial and the presence of television cameras inside and outside the courtroom, and the presence of news persons from radio and television and print media were widely known in this small town and in this small-population county...." *Venue Order*, slip op. at 2 (Finding of Fact 3). Implicit is the court's reasonable assumption that a large community would be less likely to be corrupted by sensational publicity about a trial.

{66} The trial court observed that after the first trial, comments by the attorneys, parties, and family members appeared in the news "adding to the public excitement and opinions and knowledge and information about this case in that small-population city and County." *Id.* at 3 (Finding of Fact 5). This potential for bias could only have been exacerbated by the public controversy after the second hung jury. Judge Armijo, in her dissent in the Court of Appeals opinion below, outlined the evidence mentioned by the trial court relating to the impact of the trial on the small population of Taos. *House Dissent*, 1998–NMCA–018, ¶¶ 104–07, 124 N.M. 564, 953 P.2d 737. We will not reiterate the evidence she has summarized, but we agree with her conclusion that "[t]here was sufficient evidence in the record to support the trial court's findings regarding the nature and size of the Taos community." *Id.* ¶ 107.

{67} House claims that the State, with its prejudicial statements to the press, deliberately attempted to spoil the forum. He argues that because "the State brought about the conditions which made necessary the change of venue," its motion for a venue change should have been denied. *See Martin v. Beto*, 397 F.2d 741, 747–48 (5th Cir. 1968) (evaluating whether state action spoiled venue and denied defendant a fair trial). However, as the publicity cited in the facts of this case demonstrates, the State was no more skillful than the defense in airing its opinions in the media, and if prejudice resulted from such publicity, no evidence exists

that one party was more culpable than the other.[49]

{68} We are concerned that, in discussing this issue, the trial judge inserted his own impressions of the citizens of Taos:

This Judge has presided over trials and hearing in Taos County and selected Juries there.... From this Judge's FINE experiences with Taos county jury selections and juries, the Court notes that Taos area citizens/jurors are close-knit, know and socialize with each other well, exchange news and information and points of view openly and freely, and have a great deal of personal respect and consideration for each other and their opinions and of view. Thus, they are more likely to share and learn of and know about this case and its facts, and the opinions and points of views [sic] of those who served in the two juries in this case.

*Venue Order*, slip op. at 5 (Finding of Fact 9). In the past, we have expressed disapproval of trial judges who base a venue decision on their own opinions and impressions. In *Alaniz* we reversed a conviction in part because the trial judge based his denial of a venue change upon personal impressions similar to those expressed by the judge in this case:

("The court doesn't feel that these men cannot get a fair trial in Lincoln County. On the other hand, he thinks they can get a fair trial as they can get in any county. The Court is somewhat familiar with the people in Lincoln County, having dealt with them six or seven years, and as far as the influence of the Nalda family, they have quite a bit of influence in one portion of the county, around Corona, but Capitan, Picacho, San Patricio, Green Tree, Ruidoso, there I would say that half of the people never heard of the Nalda family. I am going to overrule the motion.")

*Alaniz*, 55 N.M. at 319, 232 P.2d at 986 (quoting trial record). We held that the trial judge's opinion in *Alaniz* did not constitute evidence contradicting the material statements of fact in the defendant's motion for a change of venue and, absent evidence to the contrary, the venue change was mandatory. *Id.*

{69} In the case at hand, the judge's observations do not substantively distinguish Taos County from any other community in New Mexico and do not constitute substantive reasons for a venue change. *See Deats*, 80 N.M. at 79, 451 P.2d at 983 (noting that our venue statutes function to prevent the trial court from overruling a venue "motion on the basis of its own knowledge of local conditions"). We agree with the suggestion of the majority below regarding this matter, and disagree with the dissent's contrary conclusion. We believe that the judge's personal experiences in Taos were not appropriate evidence upon which to base a venue change. *House Majority*, 1998–NMCA–018, ¶¶ 39–40, 124 N.M. 564, 953 P.2d 737. *But see Mu'Min*, 500 U.S. at 427, 111 S.Ct. 1899 (indicating that a local judge is in a better position than an appellate court to evaluate the effect of publicity because "[t]he judge of that court sits in the locale where the publicity is said to have had its effect and brings to his evaluation of any such claim his own perception of the depth and extent of news stories that might influence a juror"); *House Dissent*, 1998–NMCA–018, ¶¶ 96, 106, 124 N.M. 564, 953 P.2d 737 (approving judge's reliance on his personal impressions). However, in the context of the other overwhelming evidence in favor of a venue change, this indiscretion is inconsequential.

### 4. Juror prejudice

{70} Though we conclude that there is substantial evidence in the record to support a presumption of prejudice that would preclude a fair trial in Taos County, it is notable that the trial court indicated that its decision was in part supported by what may arguably be described as actual prejudice. Judge Blackmer intimated that, after the second trial, it became apparent that some jurors had entered the proceeding with fixed opinions that prevented them from making a judgment exclusively on the evidence presented at trial.

> [A]t the Jury's request at the end of the second trial in November 1994, Judge Blackhurst spoke privately with the Jury; he then returned to the Courtroom and advised all Counsel that some of the jurors apparently did not disclose their biases during jury selection.... As additional ex-amples and considerations before this Court, post-trial interviews with jurors by the news media indicated hard feelings among the jurors (especially in the second trial), and apparent sympathy of some jurors that may have affected their deliberations and ensuing hung jury-and may have violated the Court's instruction that "Neither sympathy nor prejudice should influence your verdict."

*Venue Order*, slip op. at 6 (Finding of Fact 10). As noted above, the trial court must "prevent even the probability of unfairness." *Murchison*, 349 U.S. at 136, 75 S.Ct. 623. The very possibility of undisclosed actual juror prejudice during the second trial is one of the strongest arguments supporting a change of venue away from Taos County for the third trial. *Cf. State v. Shawan*, 77 N.M. 354, 358, 423 P.2d 39, 43 (1967) ("To expect a juror to confess prejudice is not always a reliable practice.").

### 5. Statements by politicians

{71} As analyzed by the Court of Appeals opinion below, the trial court based its determination in part upon the inflammatory comments about the trial made by local Taos politicians. A letter, purportedly by a former State Senator from Taos, was published in the Taos News, about two weeks after the first hung jury, harshly criticizing the prosecution and the media as racist in their treatment of House. *Venue Order*, slip op. at 3–4 (Finding of Fact 7) (discussing Letter from Francisco El Comanche Gonzales, Racist remarks, in *Favor y Contra*, Taos News, July 7, 1994, at A4 ("Since the Christmas of 1992, the media, [prosecutor] Robert Schwartz and other bigots seem to have enjoyed what I contend to be a field day with the Gordon House DWI case.")). After the second trial, the incumbent State Senator from Taos was quoted in the Albuquerque Journal accusing the prosecutor of seeking to " 'try the case 10, 15 times until he gets what he wants.' " *Id.* at 4–5 (Finding of Fact 8) (quoting Colleen Heild, *Senators Grill DA on Gordon House Case*, Albuquerque J., Feb. 25, 1995, at A10.). Judge Blackmer concluded that

"[s]uch public comments by well-known Taos area citizens ([who were] presumptively aware of-or speaking on behalf of-the Taos county constituency and their attitudes and feelings) are further circumstantial indication that at least one party probably would not receive a fair trial if a third trial were to occur in Taos County." *Id.* at 4–5 (Finding of Fact 8).

{72} The first of these newspaper articles was published approximately seven months prior to the second trial and likely was not widely remembered in Taos by the time of the third trial. *See Murphy*, 421 U.S. at 802, 95 S.Ct. 2031 (last significant publicity was seven months before jury selection). Moreover, it is impossible that the second of these newspaper articles affected Taos residents on February 7, 1995, when Judge Blackmer granted the motion to change venue, because the article was published eighteen days later on February 25. We agree with the majority below that any prejudicial effect from these articles was negligible. *See House Majority*, 1998–NMCA–018, ¶ 38, 124 N.M. 564, 953 P.2d 737. ("To the extent that both local leaders were critical of the prosecution, there was no showing in the record that their beliefs were widespread within the Taos community.").

### 6. Fixed opinions

{73} In addressing the prejudicial effect of pretrial publicity, this Court, in the past, has adopted the pronouncement in *Patton v. Yount*, 467 U.S. at 1035, 104 S.Ct. 2885, that "[t]he relevant question is not whether the community remembered the case, but whether the jurors . . . had such fixed opinions that they could not judge impartially the guilt of the defendant." *See, e.g., Chamberlain*, 112 N.M. at 726, 819 P.2d at 676; *State v. McGuire*, 110 N.M. 304, 311, 795 P.2d 996, 1003 (1990). House insists that it is impossible for a court, without questioning prospective jurors in voir dire, to obtain direct evidence that any members of a community have formed inflexible opinions about a par-

ticular case. He argues that the question of fixed opinions has been limited exclusively to determinations of actual prejudice. *See, e.g., Chamberlain*, 112 N.M. at 726, 819 P.2d at 676 (concluding that no more than voir dire was required to determine whether jurors had fixed opinions); *McGuire*, 110 N.M. at 311, 795 P.2d at 1003 (relying upon voir dire in concluding that jurors did not have fixed opinions); *Patton*, 467 U.S. at 1034–35, 104 S.Ct. 2885 (determining whether voir dire revealed "fixed opinions"); *Harris v. Pulley*, 885 F.2d 1354, 1363–64 (9th Cir.1988) (indicating that actual prejudice is established by the presence of fixed opinions). We do not believe the inquiry into fixed opinions is necessarily so limited.

{74} In this case, the trial court in its Order did not expressly conclude that "fixed opinions" predominate in Taos County. It did, however, discuss a number of events and factors that tended to "reinforce and solidify" the sentiments of the local populace. *See Venue Order*, slip op. at 4 (Finding of Fact 7). Similarly, the court also surmised that television publicity "likely would cause viewers to form opinions and make decisions about the case before trial-and thus more likely to be biased and prejudiced against one Party or the other." *Id.* at 10–11 (Finding of Fact 17(A)). The dissent below outlines a number of factors, including opinion polls, published statements by members of the community, and evidence from the jury selection during the first two trials, that tend to show a significant number of people in Taos had formed opinions about the case. *See House Dissent*, 1998–NMCA–018, ¶¶ 112–17, 124 N.M. 564, 953 P.2d 737. *But see House Majority*, 1998–NMCA–018, ¶¶ 30–31, 124 N.M. 564, 953 P.2d 737 (disputing value of opinion polls). These types of evidence circumstantially establish the presence of fixed opinions in Taos.

{75} A venue change based upon a presumption of prejudice does not require empirical proof of the presence of fixed opinions when, as in this case, there is relentless inflammatory publicity that brings a case to the attention of a substantial percentage of a comparatively small community. If any-

thing, it is unreasonable in this particular case to assume that a great many citizens did not follow the news about the case, discuss it with their neighbors, and form their own opinions. If, as *Patton* says, the "relevant question" is whether or not there are "fixed opinions," the essential objective of this entire inquiry is to guard against even the probability of an unfair trial. *Murchison,* 349 U.S. at 136, 75 S.Ct. 623. It is reasonably probable that the frenzied publicity in this case tended to solidify the opinions of so many Taos residents that the fairness of a third trial in that community would be questionable.

### D. The Presumption of Prejudice in Taos Is Supported by Substantial Evidence

{76} As the preceding evidence demonstrates, Judge Blackmer found many indicia of prejudice in Taos County. We hold that the trial court did not abuse its discretion in ordering a change of venue from Taos County. There is substantial evidence in the record to support the court's conclusions: Widespread inflammatory publicity saturated Taos County close to the time of the trials; the television, newspaper, and radio publicity was highly emotional; the comments by the parties, relatives, and the attorneys in this case further affected public sentiment; the risk of prejudice was increased by the comparatively small population of Taos; jurors in the second trial did not disclose bias during voir dire; and there was a strong likelihood that many potential jurors would enter the third trial with strong predilections toward one party or the other.

{77} We emphasize that these factors establish a strong presumption of prejudice and that there is no requirement that the venue change be based upon empirical proof of actual prejudice.

Applications for change of venue under our law are predicated on a well-grounded "fear" that [the defendant] is unlikely to obtain a fair trial and an impartial jury, in the county where the claimed crime occurred. We do not understand the statute to mean that it must be conclusively shown that it is impossible to have a fair trial in the county where the venue is laid, but it is sufficient to show a reasonable apprehension that the defendant will not secure a fair and impartial trial or that the jury are under an influence inimical to the accused. *Alaniz,* 55 N.M. at 318–19, 232 P.2d at 986 (citation omitted). Moreover, as the trial court was at pains to note, most of these indicia were not, by themselves, sufficient to warrant a presumption of prejudice. *See, e.g., Venue Order,* slip op. at 3 (Finding of Fact 6) (An admission, by defense counsel, that publicity had permeated Taos "is only one minor factor this Court should consider along with all other facts and circumstances on the Motion for Change of Venue."). We need not determine whether any of the individual factors considered by the trial court would justify a change of venue under Section 38–3–6. We conclude that these factors in aggregate constitute substantial evidence to support a reasonable probability that public excitement and local prejudice would prevent a fair and impartial third trial in Taos County.

### E. Taos Is Not The Constitutional Vicinage

{78} In addition to disputing the presumption of prejudice in Taos, House intimates that, because the State raised no objection to the move to Taos, that county is the constitutional vicinage in this case. He suggests that he had an actual right to keep the third trial in Taos. In a similar vein-though it mischaracterizes the posture of the move as a mutual stipulation rather than an unopposed motion-the majority below states that, "[s]ince both Defendant and the State stipulated to the first change of venue to Taos County, we believe both sides committed themselves to resolving this matter in Taos County unless a fair and impartial jury could not be impaneled from Taos County." *House Majority,* 1998–NMCA–018, ¶ 24, 124 N.M. 564, 953 P.2d 737. Neither of these perspectives comports with our constitution nor statutes.

{79} As we noted above, under our constitution, the first choice of venue-the constitutional vicinage-must include "an impartial jury" that is from "the county or district in which the offense is alleged to have been

committed." N.M. Const. art. II, § 14. In this case the vicinage was Bernalillo County where the accident took place. The defendant has a right to be tried in the vicinage, and convictions can be reversed when defendants have been denied this right. *See, e.g., State v. Ramirez,* 92 N.M. 206, 209, 585 P.2d 651, 654 (Ct.App.1978) (reversing convictions in which defendant was denied "right to be tried in the county where the crime was committed"). If an impartial jury cannot be obtained, the venue will be changed as required by Section 38–3–3(A). The new venue cannot be considered the constitutional vicinage, even if it is the first and only place in which the defendant is tried. This is because the new venue lacks one of the essential qualities of the vicinage: it is not the locale in which the crime was allegedly committed. In other words, upon moving for a venue change, a defendant waives his or her constitutional right to be tried in the county in which the crime was committed. *See, e.g., Alexander v. Gladden,* 205 Or. 375, 288 P.2d 219, 226 (1955). Should a motion for yet another venue change be filed, neither party has a right to remain in the second venue. Under Section 38–3–6, the decision to move to a third venue is exclusively "within the discretion of the court." Thus, House had no right to a third trial in Taos.

## V. PROBABILITY OF A FAIR TRIAL IN DOÑA ANA COUNTY

### A. House's Claims of Prejudice in Doña Ana County

{80} House asserts that he was prejudiced by the change of venue to Doña Ana County. Throughout the legal proceedings in this case, House and his supporters have accused the prosecution of vilifying House because he is a Native American.[50] Consistent with this accusation, he charges that the State sought to offensively use the venue statute against him by obtaining a new venue that is largely devoid of Native Americans. Furthermore, House argues that, with this scheme to deprive him of a racially fair

jury pool, the State intended to seat a jury that would be more likely to convict. The Court of Appeals in the opinion below focused on whether the trial court abused its discretion in concluding that Taos was a biased venue. The Court did not address House's claim, discussed in the briefs of both parties to this Court, that he suffered prejudice from the choice of Doña Ana County as a venue.

{81} The trial court and all the participants in this trial were well aware that Taos County has a 6.5% Native American adult population while Doña Ana County has only about 0.8%. *See Venue Order,* slip op. at 19 (Finding of Fact 21). House claimed that the State sought a venue free from the influence of Native American jurors because it could not get a conviction of a Native American defendant after twice trying unsuccessfully in a district with a significant Native American population. Thus, House argues that the district court abused its discretion by acceding to the move to Doña Ana County and by failing to earnestly question the State's motives in seeking a venue with a Native American population of less than 1%.

{82} The practical impact of such a venue, according to House, is that it deprived him of a jury that would understand aspects of his defense that were cognizable only in the context of Native American culture. For example, much was made of the fact that House did not mention to emergency room personnel that he was suffering from a migraine headache when he was brought to the hospital immediately after the accident. This showed, according to the State, that House was disoriented, not because of a blinding headache, but because he was drunk. House countered with evidence that he did not mention the headache because Navajos do not discuss pain and are taught to deal with it on an internal basis. Navajo medicine men testified at trial about these cultural traditions and House's earlier treatment for migraine headaches.[51] The President of the Navajo Nation wrote a letter to Judge Blackmer, urging him to select a venue that would be sensitive to this type of evidence:

> It would be a travesty of justice to see the third trial take place in a community that has little or no familiarity with our customs or culture. We have often experienced

misunderstanding and discrimination. We realize that stereotypes are common where contact and communication with our people does not occur. We ask that you consider the importance of having jurors who are not hostile to nor ignorant of our culture consider this case.

Letter from Albert Hale, President of the Navajo Nation to Hon. James F. Blackmer (circa April 5, 1995). Thus, House suggests that he suffered prejudice from the change of venue because his defense rested largely on such "cultural evidence" and would not be understood by jurors in Doña Ana County. Though House's claims of prejudice may raise disturbing questions, these claims are inconsequential unless there is substantial evidence in the record proving that he received an unfair trial in Doña Ana County. No such evidence was provided.

## B. Venue, Venire, And Petit Jury

{83} When addressing the racial composition of groups of citizens who may be empaneled to decide a case, courts have applied different rules depending upon whether the question concerns the racial makeup of a *venue*, which is the particular geographical area, usually a county or judicial district, in which a court will hear and determine a case; a *venire*, which is the jury pool or group of citizens from whom a jury is chosen in a given case; or a *petit jury*, which is an ordinary jury selected from a venire, sworn to hear the evidence presented at trial and to declare a verdict of guilt or innocence. House appears to be urging that venire and petit jury principles should be applied, by analogy, to the selection of a venue. However, our research has disclosed few courts or judges that have been willing to consider such a theory.

### 1. Racial composition of the petit jury

{84} It is well established in Federal and New Mexico law that the State may not, during the jury selection process, use its peremptory challenges to exclude otherwise unbiased and well-qualified individuals solely on the basis of their race, gender, economic status, or any other similar dis-

criminatory characteristic. *J.E.B. v. Alabama*, 511 U.S. 127, 145–46, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) (gender); *Powers v. Ohio*, 499 U.S. 400, 409, 111 S.Ct. 1364, 113 L.Ed.2d 411 (1991) (race); *State v. Gonzales*, 111 N.M. 590, 597–600, 808 P.2d 40, 47–50 (Ct.App.1991) (gender); *State v. Tapia*, 81 N.M. 365, 366, 467 P.2d 31, 32 (Ct.App.1970) (race, economic status). Such purposeful exclusions violate the constitutional right to equal protection of the laws of both the defendant and the potential jurors. *Batson v. Kentucky*, 476 U.S. 79, 85–88, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); *Gonzales*, 111 N.M. at 595, 808 P.2d at 45 (prospective jurors). This type of discrimination is deemed to be so invidious that a defendant may establish a prima facie case of discrimination even if the "defendant's racial group is not substantially underrepresented on the jury." *Gonzales*, 111 N.M. at 595, 808 P.2d at 45. Even a single instance of purposeful exclusion may establish a prima facie case of discriminatory intent. *See id.* House contends·that selecting a specific venue to purposefully preclude a particular race from a petit jury is just as unconstitutional as using peremptory challenges to systematically exclude a particular race from a petit jury.

### 2. Racial composition of the venire

{85} As with the petit jury, the venire must be selected in an entirely neutral and nondiscriminatory manner. "The Equal Protection Clause guarantees the defendant that the State will not exclude members of his race from the jury venire on account of race or on the false assumption that members of his race as a group are not qualified to serve as jurors." *Batson*, 476 U.S. at 86, 106 S.Ct. 1712 (citations and footnote omitted). The State may not pass laws or promulgate rules that expressly exclude, on the basis of race, qualified individuals from the jury pool. *See Strauder v. West Virginia*, 100 U.S. 303, 308–09, 25 L.Ed. 664 (1879). Nor may government officials implement a neutral venire selection law in a discriminatory manner. *Washington v. Davis*, 426 U.S. 229, 241, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976) ("A statute, otherwise neutral on its face, must not be applied so as invidiously to

discriminate on the basis of race."). House seeks to apply these notions to adjudicating the racial composition of a venue.

### 3. The State did not use the venue statute to achieve venire discrimination

{86} We have said that the State is forbidden from accomplishing "indirectly at the selection of the petit jury what it has not been able to accomplish directly at the selection of the venire." *State v. Aragon*, 109 N.M. 197, 201, 784 P.2d 16, 20 (1989). By analogy to this principle, House argues that the State cannot indirectly accomplish, with the selection of a particular venue, the exclusion of a particular racial group, when it is prohibited from directly discriminating in the selection of the venire.

{87} House is echoing Justice Marshall's dissent in *Mallett v. Missouri*, which concerned an African American defendant charged with murdering a white state trooper whose trial was transferred to a venue with no citizens of the defendant's race: "Just as state prosecutors may not use peremptory challenges to exclude members of the defendant's race from the jury, state trial courts may not transfer venue of the trial to accomplish the same result by another means." *Mallett v. Missouri*, 494 U.S. 1009, 1009, 110 S.Ct. 1308, 108 L.Ed.2d 484 (1990) (Marshall, J., dissenting) (citation omitted). The United States Supreme Court denied certiorari in that case, and Justice Marshall's argument in favor of granting certiorari is one of the few judicial pronouncements that we have found discussing this principle. *See id.* at 1009–12, 110 S.Ct. 1308; *see also State v. Lozano*, 616 So.2d 73, 76 (Fla.Dist.Ct.App. 1993) (reviewing trial court's decision to change venue based on the race of the victim); *Osmulski v. Becze*, 638 N.E.2d 828, 834–35 (Ind.Ct.App.1994) (in a personal injury action, applying *Batson* analysis, and holding that the plaintiff "established a prima facie case of the discrimination in" the defendant's use of the venue-change statute, and that the defendant "utilized the automatic change of venue in such a manner that it resulted in changing the jury pool from one with twenty-five percent African-Americans to one with less than one percent African-

Americans, effectively operating as strikes against every potential African–American juror in Lake County"); *State v. Harris*, 282 N.J.Super. 409, 660 A.2d 539, 542–45 (App. Div.1995) (concluding trial court should have considered racial demographics in selecting source from which to draw foreign jury).

{88} House's argument that a particular racial group is excluded by the selection of a venue can be analyzed from two different perspectives: On the one hand, a defendant may allege that the State or the trial court deliberately selected a particular venue with the objective of excluding a racial group; the venue was chosen with *discriminatory intent*. On the other hand, because the move to a particular venue has resulted in the reduction or exclusion of a racial group, the defendant may claim he or she will not receive a fair trial; the venue change has had a *discriminatory impact*. House's arguments raise both of these possibilities.

### a. Discriminatory intent

{89} As to the first possibility, House suggests that the State deliberately sought a venue with fewer Native Americans than Taos County and thus acted with discriminatory intent. House has failed to prove this contention. The right to equal protection prevents a trial court or a prosecutor from intentionally choosing a venue so as to exclude from the venire persons of a particular race. The Fourteenth Amendment forbids the State from engaging in all actions that are intentionally discriminatory on the basis of race. *See Powers*, 499 U.S. at 409, 111 S.Ct. 1364 (discussing the importance of race neutrality injury procedures in maintaining the integrity of the justice system).

{90} As indicated above, we have found surprisingly little jurisprudence on this question. There is no generally accepted test for evaluating discriminatory intent in the selection of a venue. However, we believe that the so-called *Batson* test may be adapted for this purpose. The United States Supreme Court in *Batson v. Kentucky*, 476 U.S. at 96, 106 S.Ct. 1712, created, and subsequently refined, a three-part test to evaluate whether peremptory challenges were

used to purposefully exclude a particular race from the petit jury.* The Court succinctly described the test in *Purkett v. Elem:*

> Under our *Batson* jurisprudence, once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination.

*Purkett v. Elem*, 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam). This test can be modified to examine, in a contested change of venue, the intentions behind the State's or the trial court's choice of a particular locale. *Cf. Martin v. Amoco Oil Co.*, 679 N.E.2d 139, 146 (Ind.Ct.App. 1997), *vacated on other grounds*, 698 N.E.2d 1191, *and then aff'd*, 696 N.E.2d 383 (Ind. 1998) (using *Batson* test to evaluate whether change of venue from community with 25% African–American population to community with only 1% "was the equivalent of a wholesale peremptory challenge of African–Americans").

{91} The application of a modified *Batson* test is further justified by the fact that, unlike a mandatory change of venue under Section 38–3–3, a change of venue in the trial court's discretion effectively requires the trial court to engage in a *Batson*-like inquiry. In other words, a trial court's findings of fact that a fair trial cannot be obtained in the current venue and that an alternate venue is free from exception necessarily determines that a change of venue is justified by race-neutral reasons, thereby satisfying step two of the *Batson* test. *Cf. Hernandez v. New York*, 500 U.S. 352, 362–63, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991) ("While the reason offered by the prosecutor for a peremptory strike need not rise to the level of a challenge for cause, [*Batson*, 476 U.S. at 97, 106 S.Ct. 1712], the fact that it

corresponds to a valid for-cause challenge will demonstrate its race-neutral character.").

{92} Though there was no express use of such a test by the trial court, the issue of intentional discrimination was raised below and the record contains ample evidence applicable to each step in the test. In the first step, House, as opponent of the venue change, needed to make out a prima facie case of racial discrimination in the State's motion to select a particular venue, in this case Doña Ana County. The opponent will rely on the facts concerning the selection of the specific venue in establishing a prima facie case. *Batson*, 476 U.S. at 95, 106 S.Ct. 1712. House presented a prima facie case of racial discrimination with his cultural arguments and his evidence that, after he twice had a hung jury in a community that had a significant Native American population, the State advocated the move to a venue with few Native Americans. The first part of the test is satisfied by circumstantial evidence that the prosecution proposed a venue solely on the basis of race.

{93} In the second step, the State, as proponent of that venue, must present a race-neutral explanation. Throughout this case the State was accused of racism and, in arguing in favor of the move to Doña Ana, presented several race-neutral explanations. The State's explanations included the fact that, in contrast to Taos County, Doña Ana County had not been subjected to the frequent, pervasive, contemporaneous, and highly prejudicial publicity regarding the case. Moreover, Doña Ana had a much larger population than the small close-knit community of Taos and would be less likely to be tainted by the prejudicial publicity. The State's justifications are " 'plausible' " though there is no requirement that they be even "minimally persuasive." *See Purkett*, 514 U.S. at 768, 115 S.Ct. 1769 (quoting with disapproval and reversing *Elem v. Purkett*, 25 F.3d 679, 683 (8th Cir.1994)). This is because the ultimate determination of discriminatory intent rests with the discretion of the trial court in the third part of the test. *Id.*

---

* In *State v. Begay*, 1998–NMSC–029, ¶ 15 n. 1, 125 N.M. 541, 964 P.2d 102, we left open "the question whether the New Mexico Constitution provides more protection from allegedly discriminatory peremptory challenges in criminal trials than is provided under the Fourteenth Amendment of the United States Constitution." Because this issue is left open in the context of peremptory challenges, we base our *Batson*-venue analysis upon federal equal protection principles.

{94} In the third step, once a race-neutral explanation has been tendered, the trial court must exercise its discretion in determining whether the opponent of the venue change has proven intentional racial discrimination. The trial court in its *Venue Order* reiterated many of the State's arguments in enumerating those factors that rendered Doña Ana suitable and Taos unsuitable as a venue for this trial. As our discussion of the *Venue Order* establishes, most of the trial court's reasons are supported by substantial evidence and show no abuse of discretion. We note that the *Mallett* dissent focused primarily on the discrimination of the trial court. No such discrimination has been shown here. We conclude that the selection of Doña Ana County as a new venue was race-neutral and that there is no proof of discriminatory intent.

### b. Discriminatory impact

{95} As to the question of discriminatory impact, House argues that, in ordering the venue change, the trial court abused its discretion by failing to conclude that an unfair trial was more probable because fewer Native Americans live in Doña Ana than in Taos. We disagree. There is simply no constitutional requirement in New Mexico that, prior to a venue change, a court must consider the percentage of prospective jurors who are of the same race as the defendant. "There is no outstanding precedent for requiring a trial court to consider demographic composition *sua sponte* every time a venue change is requested. The Equal Protection Clause does not require exactitude of this nature." *Rogers v. Director, TDCJ–ID,* 864 F.Supp. 584, 598 (E.D.Tex.1994).

{96} Courts have overwhelmingly been unwilling to summarily conclude that the citizens in an entire geographical region—all the potential jurors in a county or judicial district—are tainted by racial prejudice. This is why the mere statistical measure of a venue's ethnic proportions cannot, by itself, lead to the presumption that a person of a given race will be unable to receive a fair trial in that venue. There may be such homogenous geographical pockets of prejudice in America, but, even in such cases, the unsuitability of a venue can only be demonstrated in the microcosm of the venire, not in the macrocosm of census figures about the venue's ethnic composition. It is, in fact, preposterous—and a form of racism—to presume that persons of a particular color will perform jury duty in a particular way. A person's race is utterly unrelated to his or her suitability as a juror. *State v. Guzman,* 119 N.M. 190, 192, 889 P.2d 225, 227 (1994); *see also Thiel v. Southern Pac. Co.,* 328 U.S. 217, 227, 66 S.Ct. 984, 90 L.Ed. 1181 (1946) (Frankfurter, J., dissenting) (stating "the color of a man's skin is unrelated to his fitness as a juror"). In the selection of a jury, race may be used neither to justify a person's removal nor to compel a person's inclusion. *Cf. Powers,* 499 U.S. at 409, 111 S.Ct. 1364 ("An individual juror does not have a right to sit on any particular petit jury, but he or she does possess the right not to be excluded from one on account of race.").

{97} That is why Judge Blackmer emphasized that Doña Ana was chosen "to promote and protect BOTH Parties' RIGHT to a fair and impartial trial and a fair and impartial jury" and that his "decision and order selecting Doña Ana County as Venue for retrial of this case is NOT based (in whole or in part) on any other factor or consideration (including, but not limited to, ethnic/racial considerations or racial/ethnic populations or proportions in various Counties of New Mexico ...)." *Venue Order,* slip op. at 19 (Finding of Fact 22). Only by conducting voir dire, and listening to the racial opinions of individual potential jurors, can it be demonstrated that a particular venue cannot provide a jury free from racial prejudice. Through careful voir dire, fair-minded jurors can most likely be found, even in a community which has few members of the defendant's race.

{98} That is what happened in this case. The trial court conducted exhaustive voir dire in Doña Ana County. After voir dire, House did not object that, because he is Native American, he would receive an unfair trial before the petit jury that was finally seated. Nor has he suggested in retrospect that it has been revealed that the jury was tainted by racial prejudice. There is simply no evidence that House received an unfair trial because Doña Ana County has a Native American population of less than 1%.

{99} Thus, in the selection of the venue of Doña Ana County, House has shown neither that the State acted with discriminatory

**180**

intent, nor that the venue change had a discriminatory impact on his fight to a fair trial.

**C. Fair Cross Section**

■ {100} House asserts that the State's choice of venue deprived him of his right to a jury "drawn from a fair cross section of the community." *Taylor v. Louisiana*, 419 U.S. 522, 527, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). Though the phrase "fair cross section" does not appear in either the New Mexico or the United States Constitution, it has been held to be implicit in the right to a fair trial. *See* N.M. Const. art. II, § 14 (impartial jury); N.M. Const. art. II, § 18 (due process); U.S. Const. amend. VI (impartial jury); *see also Holland v. Illinois*, 493 U.S. 474, 480, 110 S.Ct. 803, 107 L.Ed.2d 905 (1990) (implicit). House's argument is somewhat unclear, but he seems to be contending that the State, by choosing a venue with a small Native American population, has racially distorted the jury pool, and has deprived him of a fair cross section of citizens from whom a fair-minded jury could be selected. The purposeful conduct of the State has, as House says, "dramatically diluted the representation of the defendant's race" within the cross section of the particular community represented by the venire. The practical consequence of House's interpretation of the fair-cross-section principle would be an increased likelihood of representation by Native Americans on the petit jury in this case.

■ {101} Once again, House is asking us to intermingle incompatible principles that apply variously to the seating of a petit jury, the composition of the venire, and the selection of a venue. The fair-cross-section requirement applies neither to the venue nor the petit jury. It addresses the constitutional fight to a venire which fairly represents the community from which it is drawn. Thus, there is "no requirement that petit juries actually chosen must mirror the community and reflect the various distinctive groups in the population. Defendants are not entitled to a jury of any particular composition." *Taylor*, 419 U.S. at 538, 95 S.Ct. 692. It is the venire from which the petit jury is chosen that must constitute a representative cross section of the community in which the trial takes place. *See Aragon*, 109 N.M. at 198–99, 784 P.2d at 17–18.

■ {102} The use of peremptory challenges by the parties to exclude individuals "thought to be inclined against their interests" is likely to result in a jury that does not mirror the community. *See Holland*, 493 U.S. at 480, 110 S.Ct. 803. However, the purpose of the fair-cross-section requirement is to assure, not a petit jury that includes members of the defendant's race or that represents the community from which it is drawn, but rather an impartial petit jury. *See Id.* Thus, Judge Blackmer, noting that Doña Ana County has a smaller Native American population than Taos, emphasized that the determining factor is not ethnicity, but rather whether the jurors are qualified and impartial. *Venue Order*, slip op. at 18 (Finding of Fact 21(D)).

■ {103} Just as the fair-cross-section requirement has no bearing on the racial mix of a petit jury, it does not affect the considerations involved in a change of venue. It refers only to the composition of the venire once a venue has been selected. Nothing in our law demands that the ethnic makeup of a new venue be similar to that of any of the preceding venues. The trial court may in its discretion determine, when selecting a new venue, that a fair trial in a particular case will be impossible unless ethnic proportions remain unchanged. But there is no requirement that the fair cross section of the old venue mirror the fair cross section of the new venue. In New Mexico, such a consideration is left to the discretion of the court. The fair-cross-section principle would have no relevance whatsoever in our review of the choice of a venue; it is relevant only to the selection of the jury pool from that venue.

**D. House Received a Fair Trial**

■ {104} The importance of "cultural evidence" to House's defense does indicate the potential for prejudice in a venue whose jurors might be insensitive to Native American culture. However, House has not offered any evidence of actual, presumed, or probable prejudice—nor even the appearance of prejudice—during the third trial in Doña Ana County. The dearth of any evidence in the record that House received an unfair trial, more than any other factor, persuades us that the Court of Appeals should be reversed and the trial court affirmed.

{105} House offered no evidence that the petit jury selection process in his third trial was anything but proper. He did not contend that the prosecution used peremptory challenges to impermissibly distort the racial composition of the petit jury. If House were to challenge, on equal-protection grounds, the racial fairness of the petit jury selection process, he would have had to establish a prima facie case that potential jurors were excluded from the jury for reasons of race. *Cf. Aragon*, 109 N.M. at 198, 784 P.2d at 17 (discussing exclusion of jurors of defendant's race). We note that equal protection in this context does not necessarily turn on the race of the defendant. *See Georgia v. McCollum*, 505 U.S. 42, 48–55, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992) (concluding that "a defendant's discriminatory exercise of a peremptory challenge is a violation of equal protection"). Our cases list several indicia that circumstantially demonstrate purposeful exclusion by the State. *Aragon*, 109 N.M. at 200, 784 P.2d at 19 (listing such factors as " 'disproportionate number of peremptories against' " a racial group (quoting *Fields v. People*, 732 P.2d 1145, 1156 (Colo.1987))). House brought no such challenge to the selection of the jury in Doña Ana County.

{106} Moreover, House offered no proof that he was tried before a biased jury in Doña Ana County. He presented no evidence that any of the jurors who actually heard the case were in any way tainted by publicity, fixed opinions, racial prejudice, or any other factor that would bring the fairness of his trial into question. *Cf. Shawan*, 77 N.M. at 357–58, 423 P.2d at 42 (describing jurors who had been influenced by prejudicial publicity).

{107} Similarly, House attempted to make no prima facie case that would show that the venire was unconstitutionally selected. If House were to bring a prima facie equal-protection challenge to the racial composition of the venire, he would have to prove "the degree of under representation [of a particular racial group] by comparing the proportion of the group in the total population to the proportion called to serve as ... jurors, over a significant period of time ." *Castaneda v. Partida*, 430 U.S. 482, 494, 97 S.Ct. 1272, 51 L.Ed.2d 498 (1977). He would then need to support the presumption raised by the statistical evidence with evidence of "a selection procedure that is susceptible to abuse or is not racially neutral." *Id.* "[A] factual inquiry is necessary in each case that takes into account all possible explanatory factors." *Alexander v. Louisiana*, 405 U.S. 625, 630, 92 S.Ct. 1221, 31 L.Ed.2d 536 (1972). House made no such challenge. In fact, though Doña Ana County has a Native American population of 0. 8%, Native Americans comprised 4.42% of the jury pool in the third trial.

{108} Though House emphasizes that a small number of Native Americans lived in Doña Ana County, he offers no evidence that Doña Ana County was an unfair venue in which to try this case. He never suggests that the people of that community, as reflected by the opinions of prospective jurors in voir dire, had such fixed opinions about this case that the jurors were incapable of laying aside their preconceived notions and basing their judgment exclusively on the evidence presented at trial. In other words, he makes no showing of actual prejudice. Similarly, he offers no evidence of the kind of presumed prejudice that rendered Taos County an unfair venue in this case. If anything, the trial court offered strong evidence to the contrary, showing that there was no inundation in the community of inflammatory publicity that would give reason to presume that the trial would be unfair. We conclude, based upon exhaustive examination of the record, that House did receive a fair trial in Doña Ana County.

{109} The trial court diligently sought a fair venue in which to hold the third trial. Judge Blackmer, in examining the various venues proffered by the parties, attempted to balance the demographic composition of the community with the amount of prejudicial publicity to which the citizens had been exposed. The trial court noted that the television stations in Albuquerque had, more than any other television market, given the House case extensive and inflammatory coverage. Doña Ana County was among those New Mexico counties that receive little coverage from Albuquerque broadcasters. *See Venue Order*, slip op. at 11–12 (Finding of Fact

17(A)). The trial court drew similar conclusions about the limited influence of Albuquerque radio and newspaper coverage on Doña Ana County. *See Id.* at 13–14 (Findings of Fact 17(B)–(C)).

{110} In Doña Ana County the trial court conducted extensive voir dire that included questions about pre-trial publicity and inquiry about racial attitudes. The trial court granted all but one of House's challenges for cause. House struck from the panel two of the jurors who identified themselves as Native Americans. House has offered no evidence that any of the prosecution's challenges involved the ethnicity of any juror. House did not object to the racial composition of the jury that was eventually seated. *See United States v. Morales*, 815 F.2d 725, 732–34 (1st Cir.1987) (describing, in sensational case in small community, exhaustive "voir dire of nearly 200 potential jurors which lasted 17 days" and concluding that the record shows jury was impartial). "The trial court's determination as to the impartiality of jurors may be set aside only for manifest error." *Id.* at 733. There is no evidence in the record that the trial court's decision departed from the dictates of "law, caution, and prudence." *Alaniz*, 55 N.M. at 318, 232 P.2d at 985.

{111} Trial courts have not only the duty to insure a fair trial, but also significant power to take precautions when prejudice threatens to deny the defendant an impartial jury. *See Martin v. Beto*, 397 F.2d at 749. The court can fulfill this duty by such measures as beginning the trial after prejudicial publicity has dissipated, conducting rigorous voir dire directed at exposing prejudice in the community, and changing venue to a community that has little awareness of the case. *See id.* (listing steps court can take to insure fair trial); *Mu'Min*, 500 U.S. at 424, 111 S.Ct. 1899 ("[T]he trial court retains great latitude in deciding what questions should be asked on *voir dire.*"). House fails to show any abuse of discretion in the trial court's efforts to insure a fair trial.

## VI. CONCLUSION

{112} Substantial evidence supports the reasonable probability that a fair trial could not be obtained in Taos County, and the trial court did not abuse its discretion by ordering a venue transfer to Doña Ana County. Though House argued he was prejudiced by the move to a venue with few Native Americans, he failed to present evidence that the third jury was biased or that his third trial was unfair. Without supporting evidence, House's claims of prejudice must fail.

## VII. ENDNOTES

1. *See, e.g.*, Nelson Martinez, *Action 7 News* (KOAT–TV, Albuquerque, N.M., news broadcast, Dec. 25, 1992) (showing images of devastated vehicles; describing accident in which "a mother and her three small children" were killed); *Head–On Wreck Kills at Least 3 on I–40 at 98th*, Albuquerque J., Dec. 25, 1992, at D2.

2. *See, e.g.*, Ed Asher, *Christmas joy filled car; then deadly crash wiped it all away*, Albuquerque Tribune, June 9, 1994, at A1 ("Paul Cravens took the stand in the Gordon House trial to recount his last thoughts before the collision that killed his wife and three stepdaughters and left him severely injured."); Brent Hunsberger & Tim Archuleta, *Driver charged with homicide*, Albuquerque Tribune, Dec. 28, 1992, at A1 ("The relatives of a mother and her three children killed in a Christmas Eve head-on collision vow to make New Mexico toughen its laws against DWI.").

3. *See, e.g.*, Greg Gurulé, *News 4 New Mexico* (KOB–TV, Albuquerque, N.M., news broadcast, probably Dec. 1992 or Jan. 1993) (showing images of devastated vehicles; interview with one of House's co-workers at House of Hope expressing "state of shock"); Gene Bellard, *I–40 DWI Suspect Runs Gallup Treatment Center*, Albuquerque J., Dec. 27, 1992, at A1.

4. *See, e.g.*, Steve Shoup, *Police Suspect Alcohol in Christmas Eve Wreck*, Albuquerque J., Dec. 26, 1992, at A1.

5. *See, e.g.*, Nelson Martinez, *Action 7 News* (KOAT–TV, Albuquerque, N.M., news broadcast, circa May 5, 1994) (showing images of devastated vehicles; interview with district

attorney, who, referring to House's statement that he bought a hamburger on Christmas Eve, derides the migraine defense as a claim that "what killed those people was a hamburger and a headache"); Ed Asher, *House's claim that migraine caused crash draws skepticism,* Albuquerque Tribune, May 5, 1994, at A1.

6. *See, e.g.,* Stuart Dyson, *News 4 New Mexico* (KOB–TV, Albuquerque, N.M., news broadcast, circa May 5, 1994) (showing images of devastated vehicles; interview with House saying migraine, rather than alcohol was the cause); Leslie Linthicum, *Migraine Caused Crash, House's Lawyer Says,* Albuquerque J., May 5, 1994, at A1.

7. *See, e.g.,* Ed Asher, *Witnesses: 90 mph wrong-way driver was unstoppable,* Albuquerque Tribune, July 14, 1993, at A1.

8. *See, e.g.,* Patricia Gabbett Snow, *Officer: Pickup Sped Wrong Way 10 Miles: Witness Reports Seeing Vehicle West of City,* Albuquerque J., Jan. 9, 1993, at A1.

9. *See, e.g.,* Andrew Amador, *Q 13 News* (KRQE–TV, Albuquerque, N.M., news broadcast, Dec. 29, 1992) (stating House's blood alcohol content was released showing 1.0% five hours after accident and revealing House's prior DWI conviction); Leslie Linthicum, *Experts Debate Crash Cause: Effects of Migraine, Alcohol Key to Case,* Albuquerque J., May 18, 1995, at C1.

10. *See, e.g.,* Ed Asher, *House's migraines almost like strokes, defense says,* Albuquerque Tribune, June 8, 1994, at A3.

11. *See, e.g.,* Ed Asher, *Suspect had DWI conviction: Driver told rescuers he drank before crash,* Albuquerque Tribune, Dec. 29, 1992, at A5.

12. *See, e.g.,* David Gregory, *Q 13 News* (KRQE–TV, Albuquerque, N.M., news broadcast, Dec. 29, 1992) (showing images of devastated vehicles; grieving and angry mourners at funeral service, minister proclaiming "I pronounce to this state that a new DWI law will go into effect called the 'Cravens Bill' "); Ed Asher, *A heart cry of thousands,* Albuquerque Tribune, Dec. 29, 1992, at A1 ("More than 2,500 poured into Victory Love Fellowship to mourn the death of a young mother and her three daughters and to pray for an end to the state's DWI problem.").

13. *See, e.g.,* Tom Joles, *A New Mexico Family Tragedy: DWI* (KOB–TV, Albuquerque, N.M., news broadcast, probably early 1993) (Closing comments to one-hour news special: "I have been in the news business for thirteen years and never have I heard people talk about a car accident like they have about the one on Christmas Eve. The timing of the accident couldn't have been worse. But, as one member of the Cravens family told me, it couldn't have been better. It came at a time when most of us were getting together with our families to celebrate life, togetherness, and the future. The future has now been altered forever for the Cravens, the Milfords, the Woodards, and the Houses. But it does not have to be altered for you or me or maybe that child who may be sitting next to you on the couch.... It's time for us to face up to our [DWI] problem and do something about it."); Greg Gurulé, *News 4 New Mexico* (KOB–TV, Albuquerque, N.M., news broadcast, probably Dec. 1992) (showing images of devastated vehicles; State Representative Marty Lambert, a relative of victims, on phone "pushing for tougher DWI laws" by asking other politicians to attend funeral); Phil Casaus, *Mourners Shed Countless Tears,* Albuquerque J., Dec. 30, 1992, at A1 ("Thousands Ask DWI Reform At Funeral of Mother, 3 Girls").

14. *See, e.g.,* Laura K. Trujillo, *'We've lost all our dreams',* Albuquerque Tribune, Jan, 8, 1993, at A1 ("Dead girls' father struggling to cope after crash"); Ed Asher, *Milford vents fury on man who 'killed my babies',* Albuquerque Tribune, June 16, 1994, at A1.

15. *See, e.g.,* Joel Loy, *Inside Edition* (King World Prods., Inc., syndicated national news program, Dec. 17, 1993) (showing images of devastated vehicles; feature on Nadine Milford's crusade against drunk driving; emotional interviews with Milford and her relatives, and with weeping House; beginning, "This is the story of a tragedy, a senseless horror that belies the scenic beauty of the State of New Mexico in which it occurred. It is also the story of a grandmother's crusade to see that her loved ones did not die in vain.").

16. *See, e.g.,* Conroy Chino, *News 4 New Mexico* (KOB–TV, Albuquerque, N.M., news broadcast, probably early 1993) (showing images of devastated vehicles; emotional interviews with House's family, describing their experiences of threats and racism); Valerie

Taliman, *Family seeks fair Justice,'* Navajo Times, Jan. 14, 1993, at 1; Leslie Linthicum, *Navajos Rally Around Man Charged in Crash,* Albuquerque J., Jan. 16, 1993, at A1 ("Media Accused of Ignoring Alcohol–Related Indian Deaths").

17. *See, e.g.,* John Fleck, *DA Denies Race Charge by House's Lawyer,* Albuquerque J., May 11, 1994, at C3; Laura K. Trujillo, *Scum of the earth or a hero?,* Albuquerque Tribune, June 22, 1994, at A1 ("The lawyer who represented Gordon House is loved and hated by New Mexicans, admired and criticized by other attorneys for his creative defenses."); Leslie Linthicum, *DA Regrets Harsh House Comments: Schwartz Apologizes for Criticizing Jury,* Albuquerque J, June 28, 1994, at A1.

18. *See, e.g.,* Tim Gallagher, *Give up the lame excuses, Gordon: This drunken driver made a tragic mistake; he should just admit it,* Albuquerque Tribune, June 20, 1994, at A10.

19. *See, e.g.,* Letter from Marie Chavez, *Far too many killers go free,* in *Letters to the Editor,* Albuquerque Tribune, June 23, 1994, at A13; Letter from Frank J. Crosby, *First, House: now Simpson,* in *Letters to the Editor,* Albuquerque Tribune, June 27, 1994, at A11; Letter from Dan Porter, *Why do we keep such bad judges?,* in *Letters to the Editor,* Albuquerque Tribune, Nov. 29, 1994, at A9.

20. Pris Gineris, *Pris Gineris Show,* (KDEF–AM, Albuquerque, N.M., radio broadcast, Dec. 13, 1994) (interview and call-in talk show featuring Ray Twohig, House's attorney; including listener who speculates that Twohig will suffer on Judgment Day because of his representation of House).

21. *See, e.g.,* Lesley Casias, *Vacant desks reminders of 3 lovable little girls,* Albuquerque Tribune, Dec. 29, 1992, at C8. .

22. *See, e.g., House Trial Judge Hushes Families: Loud Talk Before Jurors Could Cause Mistrial,* Albuquerque J., May 12, 1995, at A1.

23. *See, e.g.,* Associated Press, *Lawyers in Gordon House case gagged,* Albuquerque Tribune, May 18, 1994, at A3.

24. *See, e.g., N.M. High Court Lifts House Case Gag Order,* Albuquerque J., Mar. 23, 1995, at C3; Associated Press, *House's At-torney Fights Gag Order,* Albuquerque J., Dec. 28, 1994, at C3.

25. *See, e.g.,* David Gregory & Andrew Amador, *Q 13 News* (KRQE–TV, Albuquerque, N.M., news broadcast, probably July 1993) (showing images of devastated vehicles; discussing whether publicity has prejudiced the case); Ed Asher, *Experts say fair trial for House will be difficult,* Albuquerque Tribune, June 6, 1994, at A1; Leslie Linthicum, *The Gordon House Show: N.M.'s All–Too Familiar Courtroom Drama New to Court TV Viewers,* Albuquerque J., May 21, 1995, at B12.

26. *See, e.g. Court Denies House's Request,* Albuquerque J., Sept. 24, 1993, at D3.

27. *See, e.g.,* Susanne Burks, *House Murder Hearing Begins,* Albuquerque J., Sept. 28, 1993, at A1 ("Alcohol Level Estimated at 0.18%").

28. *See, e.g.,* David Gregory, *Q 13 News* (KRQE–TV, Albuquerque, N.M., news broadcast, Oct. 29, 1993) (showing images of devastated vehicles; reactions to dismissal of murder charges; interview with Melanie Craven's father claiming victims of crime have no rights); Leslie Linthicum, *No Murder Charges For House: Judge 'Caved In' Victims' Grandpa Says,* Albuquerque J., Oct. 29, 1993, at A1; Ed Asher, *DWI ruling: Strong or wimpy?,* Albuquerque Tribune, Oct. 29, 1993, at A1 ("The victims' family members are angry, while Gordon House's attorney said the judge showed great strength in dropping four murder charges.").

29. *See, e.g.,* Susanne Burks, *Judge Moves House Trial to Taos,* Albuquerque J., Mar. 24, 1994, at B4.

30. *See, e.g.,* Leslie Linthicum, *House's Legal Drama Enters Jury Selection,* Albuquerque J., June 5, 1994, at A1.

31. *See, e.g.,* Leslie Linthicum, *Jurors Took Emotional Offramp: Public Dismayed by House Decision,* Albuquerque J., June 21, 1994, at A1.

32. *See, e.g.,* Laura K. Trujillo & Gilbert Gallegos, *DA wants House retrial moved,* Albuquerque Tribune, June 21, 1994, at A1.

33. *See, e.g.,* Susanne Burks, *House Re-trial To Stay In Taos, Judge Rules,* Albuquerque J., Aug. 24, 1994, at C3.

34. *See, e.g.,* Leslie Linthicum, *House Re-Trial Starts With Battle: Jurors' Driving Files Spur Defense Motion,* Albuquerque J., Nov. 8, 1994, at C3.

35. *See, e.g.,* Karen Canto, *Q 13 News* (KRQE–TV, Albuquerque, N.M., news broadcast, Nov. 23, 1994) (announcing second mistrial; interviews with attorneys, House, members of Cravens family); Leslie Linthicum, *House Jury Deadlocks: DA Wants Third Trial in Another Town,* Albuquerque J., Nov. 24, 1994, at A1; Ed Asher, *Behind closed doors,* Albuquerque Tribune, Nov. 25, 1994, at D I ("A woman and three daughters die in a wreck with a man driving drunk on the wrong side of the highway. How could two juries fail to convict Gordon House of killing them? Jurors are confronted with realities that casual observers never see.").

36. Colleen Heild, *Senators Grill DA on Gordon House Case,* Albuquerque J., Feb. 25, 1995, at A10.

37. Ray Twohig, *Justice Would Not Be Served by Third Trial for Gordon House,* Albuquerque J., Dec. 2, 1994, at A15.

38. *See, e.g.,* Leslie Linthicum, *House Judge Gets Gag Request,* Albuquerque J., Dec. 14, 1994, at C3 ("Twohig Remarks Irk Prosecutors").

39. *See, e.g.,* Associated Press, *House's Attorney Fights Gag Order,* Albuquerque J., Dec. 28, 1994, at C3.

40. *See, e.g., N.M. High Court Lifts House Case Gag Order,* Albuquerque J., Mar. 23, 1995, at C3.

41. *See, e.g.,* Tribune Staff, *Third House trial: Justice or cruelty?,* Albuquerque Tribune, Nov. 25, 1994, at A1 ("Anti–DWI activists favor another trial, while some attorneys say it would be unfair to the defendant.").

42. *See, e.g.,* Associated Press, *High Court Allows Third House Trial: Hearing Set Today On Delay Request,* Albuquerque J., Apr. 28, 1995, at D3.

43. *See, e.g.,* Pete Herrera, *Third House trial opens here Friday,* Las Cruces Sun-News, May 4, 1995, at A1; Leslie Linthicum, *Court TV Picks Up Third House Trial: Cruces Proceedings Will Fill O.J. Gaps,* Albuquerque J., May 5, 1995, at A1.

44. *See, e.g.,* Leslie Linthicum, *Guilty On All Counts: House Jury Mulls Less Than 5 Hours,* May 27, 1995, at A1.

45. *See, e.g.,* Leslie Linthicum, *Judge Gives House 22 Years, DWI Wreck Killed Mother, Three Girls,* Albuquerque J., July 25, 1995, at A1.

46. *See, e.g.,* Leslie Linthicum, *Fatal–Crash Convictions Tossed,* Albuquerque J., Nov. 21, 1997, at A1 ("Court: Moving Trial a Mistake").

47. *See, e.g.,* Barry Massey, *High Court To Review House Case: Vehicular Homicide Overturned on Appeal,* Albuquerque J., Jan. 15, 1998, at D3.

48. *See, e.g.,* Leslie Linthicum, *Court Urged To Resolve House Case: State Wants Convictions In 4 Deaths Reinstated,* Albuquerque J., Apr. 1, 1998, at A1.

49. *See, e.g.,* Leslie Linthicum, *Jurors Took Emotional Offramp: Public Dismayed by House Decision,* Albuquerque J., June 21, 1994, at A1; Leslie Linthicum, *House's Lawyer Calls Murder Charge 'Flaky',* Albuquerque J., Apr. 2, 1993, at D3.

50. *See, e.g.,* Conroy Chino, *News 4 New Mexico* (KOB-TV, Albuquerque, N.M., news broadcast, probably early 1993) (showing images of devastated vehicles; emotional interviews with House's family, describing their experiences of threats and racism); John Fleck, *DA Denies Race Charge by House's Lawyer,* Albuquerque J., May 11, 1994, at C3; Associated Press, *Racism A Factor, House Says,* Albuquerque J., Mar. 30, 1993, at A1.

51. Leslie Linthicum, *Navajo Explains Culture to Jury,* Albuquerque J., May 20, 1995, at C3 ("Medicine Man Treated House's Headaches On Three Occasions").

{113} We therefore reverse the Court of Appeals and affirm the trial court.

{114} **IT IS SO ORDERED.**

WE CONCUR: PAULA B. MINZNER, Chief Justice, JOSEPH F. BACA, Justice, and PATRICIO M. SERNA, Justice.