This decision of the Supreme Court of New Mexico was not selected for publication in the New Mexico Appellate Reports. Refer to Rule 12-405 NMRA for restrictions on the citation of unpublished decisions. Electronic decisions may contain computer-generated errors or other deviations from the official version filed by the Supreme Court.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Filing Date: June 26, 2025**

**No. S-1-SC-39925**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**IZAIAH GARCIA,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Brett R. Loveless, District Judge**

Bennett J. Baur, Chief Public Defender
Kimberly Chavez Cook, Appellate Defender
Thomas J. Lewis, Assistant Appellate Defender
Santa Fe, NM

for Appellant

Raúl Torrez, Attorney General
Santa Fe, NM
Walter Hart, Assistant Attorney General
Albuquerque, NM

for Appellee

**DECISION**

**THOMSON, Chief Justice.**

**{1}** On direct appeal, Izaiah Garcia (Defendant) challenges his convictions for first-degree depraved mind murder, NMSA 1978, § 30-2-1(A)(3) (1994), and aggravated assault with a deadly weapon, NMSA 1978, § 30-3-2(A) (1963). Defendant raises two

issues for our review: (1) Are his convictions supported by sufficient evidence? and (2) Did the district court abuse its discretion in denying his motion for a change of venue?

**{2}** We determine that Defendant's first-degree murder conviction is supported by sufficient evidence and that the district court did not abuse its discretion in denying his motion for a change of venue. We decline to review the sufficiency of the evidence supporting Defendant's aggravated assault conviction because his argument is unsupported by law or analysis. We therefore affirm Defendant's judgment and sentence. We resolve this appeal through a nonprecedential decision because both issues are disposed of by the presence of substantial evidence. *See* Rule 12-405(B)(2) NMRA.

## I.    BACKGROUND

**{3}** Sean Markey (Victim) was killed by gunfire outside a party on Garcia Street NE in Albuquerque on the evening of September 29, 2019. Due to the number of individuals at the party, the relationships between the witnesses, and the number and variety of shell casings at the scene, the evidence collected at the crime scene was voluminous. Specific discussion of the evidence will be provided in the analysis of Defendant's claims on appeal; however, there are evidentiary facts of note: (1) Victim's killing was captured on surveillance video, (2) eyewitnesses and friends of those present testified to what happened the night of the shooting, and (3) the State's firearms expert, Michael Haag, opined on the location of the shell casings that matched the bullet that killed Victim. The surveillance video and testimony were consistent with the theory that Defendant shot from the location identified by Haag toward his enemy, Christian Mattock; bullets that missed Mattock but instead killed Victim. Defendant was convicted of first-degree depraved mind murder and aggravated assault with a deadly weapon. The day before trial, Defendant filed a motion for change of venue, which the district court implicitly denied.

## II.    DISCUSSION

### A.    Sufficiency of the Evidence

**{4}** Although Defendant challenges the sufficiency of the evidence supporting both his first-degree murder and aggravated assault convictions, his entire argument is directed at the first-degree murder conviction. The aggravated assault convictions consume two headings and two conclusory sentences. Because Defendant's challenge to his aggravated assault conviction is unsupported by any law or analysis, we decline to review it. *See In re Adoption of Doe*, 1984-NMSC-024, ¶ 2, 100 N.M. 764, 676 P.2d 1329 ("Issues raised in appellate briefs which are unsupported by cited authority will not be reviewed by us on appeal."); *Elane Photography, LLC v. Willock*, 2013-NMSC-040, ¶ 70, 309 P.3d 53 ("We will not review unclear arguments, or guess at what a party's arguments might be." (brackets, internal quotation marks, and citation omitted)). Therefore, we only review the sufficiency of the evidence supporting Defendant's first-degree murder conviction.

**1.      Standard of review**

**{5}**      "Evidence is sufficient to sustain a conviction when there exists substantial evidence of a direct or circumstantial nature to support a verdict of guilt beyond a reasonable doubt with respect to every element essential to a conviction." *State v. Smith*, 2016-NMSC-007, ¶ 19, 367 P.3d 420 (internal quotation marks and citation omitted). "Substantial evidence is such relevant evidence that a reasonable mind would find adequate to support a conclusion." *State ex rel. King v. B & B Inv. Grp., Inc.*, 2014-NMSC-024, ¶ 12, 329 P.3d 658 (internal quotation marks and citation omitted). The key inquiry is "whether *any* rational jury could have found each element of the crime to be established beyond a reasonable doubt." *State v. Garcia*, 1992-NMSC-048, ¶ 27, 114 N.M. 269, 837 P.2d 862. We view "the evidence in the light most favorable to the guilty verdict, indulging all reasonable inferences and resolving all conflicts in the evidence in favor of the verdict." *State v. Montoya*, 2015-NMSC-010, ¶ 52, 345 P.3d 1056 (internal quotation marks, brackets, and citation omitted). We "will not invade the jury's province as fact-finder by second-guessing the jury's decision concerning the credibility of witnesses, reweighing the evidence, or substituting [our] judgment for that of the jury." *State v. Garcia*, 2016-NMSC-034, ¶ 15, 384 P.3d 1076 (brackets and citation omitted).

**2.      First-degree depraved mind murder**

**{6}**      First-degree depraved mind murder "is the killing of one human being by another without lawful justification or excuse . . . by any act greatly dangerous to the lives of others, indicating a depraved mind regardless of human life." § 30-2-1(A)(3). On the charge of first-degree depraved mind murder, the jury was instructed that to find Defendant guilty, they must find the following elements beyond a reasonable doubt:

1.  The defendant shot a firearm at Christian Mattock while chasing Christian Mattock in a residential area with other people present in the area[;]

2.  The defendant's act caused the death of Sean Markey[;]

3.  The act of the defendant was greatly dangerous to the lives of others, indicating a depraved mind without regard for human life;

4.  The defendant knew that the act was greatly dangerous to the lives of others;

5.  This happened in New Mexico on or about the 29th day of September, 2019.

The jury was also instructed that "[a] person acts with a depraved mind by intentionally engaging in outrageously reckless conduct with a depraved kind of wantonness or total indifference for the value of human life," and that "the defendant must have a corrupt, perverted, or malicious state of mind, such as when a person acts with ill will, hatred, spite, or evil intent." "[J]ury instructions become the law of the case against which the

sufficiency of the evidence is to be measured." *State v. Arrendondo*, 2012-NMSC-013, ¶ 18, 278 P.3d 517 (internal quotation marks and citation omitted).

**{7}** Defendant makes three arguments why the evidence was insufficient for the jury to find that the actus reus and mens rea requirements for first-degree depraved mind murder were met: (1) someone else could have fired the fatal shot, (2) the jury had to "make assumptions" about the identity of the figures in surveillance video and "speculate" that Defendant fired the fatal shot with the requisite mens rea, and (3) the testifying witnesses were not credible. None of these arguments are supported by the evidence presented at trial.

### a. Sufficient evidence supports that Defendant, not another shooter, killed Victim

**{8}** Defendant first argues that the evidence is insufficient to support that he, instead of someone else, fired the fatal shot.

**{9}** Defendant highlights the testimony of Elijah Yambao, a friend of Victim who was at the party, to suggest that a number of people at the party might have wanted to hurt Victim and thus may have fired the fatal shot. Yambao testified that Victim "didn't like people inside the party" and Victim's friend Drew Taylor "wanted to cause turmoil with people." Yambao further testified that he left Victim and Taylor on the street corner where Victim was later shot while he went to pick up another friend from the party because "[Victim and Taylor] were having problems with people inside the party."

**{10}** Defendant also suggests that the testimony of Detective Kastendieck, the detective on the case, implies there were other explanations for the shooting. Kastendieck testified that she did not investigate any other suspects, although at least one other individual at the party shot a gun and one witness stated that someone other than Defendant had shot Victim. Kastendieck also testified that she did not know that Defendant arrived at the party with two more friends, and she did not attempt to identify two people running nor the driver of a car passing through the scene of the shooting. Kastendieck also acknowledged that Defendant was wearing a gray t-shirt in a surveillance video, while some witnesses stated that the shooter was wearing a black or blue hoodie, suggesting potential misidentification.

**{11}** However, the State's evidence that Defendant fired the fatal shot was overwhelming, including surveillance video, eyewitness testimony, expert testimony, and most significantly, testimony that Defendant later admitted to shooting at his enemy, Mattock.

**{12}** Eyewitnesses Tanner White and Zeke Fox attended the party with Defendant. At the end of the evening, Defendant, White, and Fox left the party and walked toward Defendant's car parked near the intersection of Garcia Street and James Place. Mattock was on the street outside the party. Victim and Taylor were seated on a rock on the corner of the intersection, waiting for Yambao to pick them up.

**{13}**    In the moments that followed, Victim was shot. White testified that Mattock confronted Defendant and Defendant shot at Mattock, and White also identified Mattock and Defendant in surveillance videos. White specifically testified that flashes in a surveillance video were bullets fired from Defendant's gun. Fox testified that he saw Defendant shooting and identified him in surveillance video. Taylor testified that the shots that killed Victim came from "the side [of the street] we're sitting on . . . about two or three houses up."

**{14}**    Haag, the State's firearms expert, testified that the area surrounding the party was covered in shell casings of different calibers from different firearms. He explained that Victim was killed by a 9mm caliber bullet. Haag further explained that, in his opinion, only 9mm casings at one location in the party area could have been those of the fatal projectile because of markings that suggested the projectile struck a driveway between leaving the firearm and contacting Victim. However, the murder weapon was never found.

**{15}**    The parties concede the location Haag identified as the origin of the fatal shot matches the location that White, Fox, and Taylor explained was where Defendant shot at Mattock. Defendant, however, denied any involvement in the shooting. Nevertheless, White, Fox, and another friend who was not at the party that evening, Gabriel Marquez, testified that Defendant later admitted to them that he shot at Mattock.

**{16}**    Based on this evidence, a rational jury could have concluded that Defendant fired the fatal shot beyond a reasonable doubt. *See Garcia*, 1992-NMSC-048, ¶ 27 (describing the key inquiry as "whether *any* rational jury could have found each element of the crime to be established beyond a reasonable doubt"). Defendant only points out perceived insufficiencies in the State's case. However, our standard of review requires us to view the evidence in the light most favorable to the State and "[c]ontrary evidence supporting acquittal does not provide a basis for reversal because the jury is free to reject Defendant's version of the facts." *Montoya*, 2015-NMSC-010, ¶ 52 (internal quotation marks and citation omitted).

**b.    The jury was not forced to make assumptions and speculate**

**{17}**    Defendant also argues that the dark surveillance videos required the jury to "make assumptions" about the identity of the figures. However, the jury needed not make assumptions, but could instead rely on the eyewitness testimony of White and Fox identifying Defendant. The jury's determination about the identity of the figures in the surveillance videos was within its purview as the factfinder and based on evidence in the record rather than mere assumption. *State v. Gallegos*, 2011-NMSC-027, ¶ 15, 149 N.M. 704, 254 P.3d 655 ("We are at all times mindful of the jury's fundamental role as factfinder in our system of justice and the independent responsibility of the courts to ensure that the jury's decisions are supportable by evidence in the record, rather than mere guess or conjecture." (internal quotation marks and citation omitted)).

**{18}**    Similarly, Defendant argues there was insufficient evidence that he fired the fatal shot with the requisite mens rea, forcing the jury to "speculate." Defendant correctly

explains that "[a] reasonable inference is a . . . rational and logical deduction from facts admitted or established by the evidence," *Samora v. Bradford*, 1970-NMCA-004, ¶ 6, 81 N.M. 205, 465 P.2d 88, but that a conviction cannot be based on speculation, conjecture, or surmise, *State v. Ledbetter*, 2020-NMCA-046, ¶ 14, 472 P.3d 1287; *State v. Rojo*, 1999-NMSC-001, ¶ 31, 126 N.M. 438, 971 P.2d 829.

**{19}**     But the testimony of three witnesses shows the jury did not need to speculate as to Defendant's mens rea. White and Fox testified that Defendant bore ill-will toward Mattock for a violent altercation in which Marquez was pistol-whipped several years before, so Defendant sought revenge against Mattock. Marquez confirmed this incident and that it upset Defendant. Additionally, Marquez testified that Defendant told him "Yeah, I saw [Mattock] and I had my hand out like—I heard gunshots, so I grabbed my gun from my waist and I pointed it at him, and I had my bottle in one hand when I was shooting at him, like Superman." White also testified that the street was crowded with people and vehicles during the shooting.

**{20}**     As the State points out, the jury's inference that Defendant possessed the requisite mens rea at the time of the shooting was reasonable. While testimony about Defendant's general ill-will toward Mattock does not necessarily speak to his mens rea at the time of the shooting, it is relevant context to establishing that Defendant acted with ill-will, hatred, spite, or evil intent. Moreover, Marquez's testimony about how Defendant recalled the event and White's testimony about the crowded street during the shooting certainly speak to Defendant's mens rea in the moment as demonstrating a depraved kind of wantonness or total indifference for the value of human life. The jury's conclusion that Defendant acted with the requisite mens rea was based on the sufficient evidence in the record, not on speculation, conjecture, or surmise. *See Gallegos*, 2011-NMSC-027, ¶ 15.

**c.        The jury reasonably concluded that the witnesses were credible**

**{21}**     Defendant's final argument is that the evidence is insufficient because White, Fox, and Marquez's testimony was not credible and they were the only witnesses to testify to Defendant's actus reus and mens rea.

**{22}**     Defendant points out that White and Fox lied in their initial interviews with detectives and were inebriated during the contested events. White and Fox testified that they initially lied to the detectives to protect Defendant, but that they ultimately were truthful. Defendant explained in an interview with detectives that he, White, and Fox were inebriated the night of the killing, which both White and Fox admitted.

**{23}**     Defendant also points out that Marquez was charged as a co-defendant with Defendant in another case and the State agreed to leniency in exchange for Marquez's testimony against Defendant in this case. Defendant frames Marquez's testimony as

"accomplice testimony." At trial, Marquez admitted that he entered into a plea agreement for "some felonies" in exchange for his testimony in this case.[1]

**{24}** We agree with Defendant that a witness's "plea deal, criminal history, and prior false statements to law enforcement all could have provided the jury with legitimate reasons to doubt [the witness's] testimony." *State v. Tollardo*, 2012-NMSC-008, ¶ 48, 275 P.3d 110. However, this type of evidence only goes to the weight or credibility of the witness's testimony, and we will not second-guess the jury's credibility determinations. *See Garcia*, 2016-NMSC-034, ¶ 15 (explaining that a court "will not invade the jury's province as fact-finder by second-guessing the jury's decision concerning the credibility of witnesses" (brackets and citation omitted)). Here, the jury clearly credited White, Fox, and Marquez's testimony incriminating Defendant to conclude beyond a reasonable doubt that he fired the fatal shot. On this point alone, Defendant's argument fails. We explain further why Defendant's two legal bases for this argument are flawed.

**{25}** First, Defendant mischaracterizes the issue as not one of weighing witness credibility, but instead one of forcing the jury to speculate and make attenuated inferences. Defendant cites *Rojo* to argue that the jury's determination of which of White and Fox's statements were truthful—their first statement to detectives or their subsequent changed story—was based "on mere conjecture or surmise." 1999-NMSC-001, ¶ 31. However, in *Rojo*, the court reasoned that, absent *any* evidence to satisfy two of the elements of the crime, the jury *must have* speculated to find the defendant guilty. *Id.* ¶¶ 31-34. In this case, there was not a *lack* of evidence but instead *conflicting* evidence: White and Fox first lied to detectives and then changed their stories. Defendant similarly argues that White and Fox's inebriation forced the jury to guess what took place that night, or make an inference "based on a series of inferences." *U.S. v. Pettigrew*, 77 F.3d 1500, 1521 (5th Cir. 1996). However, in *Pettigrew*, the court reasoned similarly to the court in *Rojo* that *insufficient* evidence necessarily led to improper inferences. *Id.* Here, there was not a *lack* of evidence but instead potentially *unreliable* evidence. Thus, it is sufficient to say that we will not second-guess the jury's credibility determinations of White and Fox. *See Garcia*, 2016-NMSC-034, ¶ 15.

---

[1]This decision takes judicial notice of district court documents that do not appear to be in the record but are easily accessed on Odyssey. *See* Rule 11-201(B)(2) NMRA (establishing that a "court may judicially notice a fact that is not subject to reasonable dispute because it . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"). These documents are not used to establish any controversial facts, but instead to substantiate Defendant's claims about Marquez's plea agreement. The felonies Marquez entered into a plea agreement for were conspiracy to commit armed robbery and tampering with evidence. *See* Plea and Disposition Agreement, *State v. Marquez*, D-202-CR-2020-01855 (2d Jud. Dist. Ct. Sept. 2, 2020) (explaining that Marquez agreed to plead guilty to certain crimes in exchange for his testimony against Defendant in the current proceeding). Defendant was convicted of several crimes from the same underlying events, including first-degree depraved mind murder for the killing of Cayla Campos, which Defendant refers to in his briefing as the "Pokémon Go" murder. *See* Judgment and Sentence, *State v. Garcia*, D-202-CR-2020-02265 (2d Jud. Dist. Ct. July 30, 2024) (sentencing Defendant for his first-degree depraved mind murder conviction); Criminal Information, *State v. Garcia*, D-202-CR-2020-02265 (2d Jud. Dist. Ct. Nov. 13, 2020) (naming Cayla Campos as the victim).

**{26}**     Second, Defendant mischaracterizes New Mexico law to argue that Marquez's testimony, as "accomplice testimony," needed to be viewed by the jury with increased skepticism. The State argues that Marquez was not an accomplice in the present case, only the "Pokémon Go" case, so the law on accomplice testimony does not apply. We do not need to consider this counterargument, however, because New Mexico law does not impose *any* special requirements for accomplice testimony.

**{27}**     It is uncontroverted that, under New Mexico law, a defendant is not entitled to a separate jury instruction on accomplice testimony and traditional methods to challenge credibility are sufficient. *See, e.g.*, *State v. Smith*, 2001-NMSC-004, ¶¶ 25-29, 130 N.M. 117, 19 P.3d 254 ("[T]he trial court did not err when it . . . refused the additional instruction on witness credibility . . . Defendant consistently challenged [the accomplice's] credibility, cross-examined him in detail on the inconsistencies in his multiple statements and about the plea agreement, and, in closing argument, continued to attack [the accomplice's] testimony as not being credible."); *State v. Godoy*, 2012-NMCA-084, ¶ 18, 284 P.3d 410 ("[I]t is sufficient for the district court to allow a witness who has arranged a lighter sentence in exchange for his testimony to be cross-examined by defense counsel, who has adequate opportunity to challenge the witness's credibility."). Although a jury instruction exists for accomplice testimony, UJI 14-5015 NMRA, the instruction's use note provides that "no instruction on this subject shall be given" and its committee commentary explains that "no instruction is necessary because the matter is adequately covered by UJI 14-5020 [NMRA]," the basic instruction on the credibility of witnesses. *State v. Sarracino,* 1998-NMSC-022, ¶¶ 8-9, 125 N.M. 511, 964 P.2d 72. Thus, it is sufficient to say that we will not second-guess the jury's credibility determination of Marquez. *See Garcia*, 2016-NMSC-034, ¶ 15.

**{28}**     In summary, a rational jury could have found, beyond a reasonable doubt, that Defendant's acts satisfied the actus reus and mens rea requirements for first-degree depraved mind murder. *See Garcia*, 1992-NMSC-048, ¶ 27. The jury was presented with ample testimony from lay and expert witnesses, whose credibility they assessed, as well as surveillance videos to reach their conclusion.

## B.     Defendant's Motion for a Change of Venue

**{29}**     The grant or denial of a motion for change of venue is reviewed for abuse of discretion. *State v. Barrera*, 2001-NMSC-014, ¶ 11, 130 N.M. 227, 22 P.3d 1177. In assessing abuse of discretion claims, we ask whether a court's venue determination is supported by substantial evidence in the record. *State v. House*, 1999-NMSC-014, ¶ 32, 127 N.M. 151, 978 P.2d 967. The burden to prove an abuse of discretion is on the party opposing the venue determination. *Barrera*, 2001-NMSC-014, ¶ 11.

**{30}**     A defendant has a constitutional right to an impartial jury. N.M. Const. art. II, § 14; U.S. Const. amend. VI. A party may request a change of venue if they believe it is impossible to seat an impartial jury because of prejudice. NMSA 1978, § 38-3-3(B)(3) (2003). The trial court may grant a change of venue based on presumed or actual prejudice. *State v. Astorga*, 2015-NMSC-007, ¶ 68, 343 P.3d 1245. A trial court grants a change of venue based on presumed prejudice if the community "is so saturated with

inflammatory publicity about the crime that it must be presumed that the trial proceedings are tainted." *House*, 1999-NMSC-014, ¶ 46. In contrast, a trial court grants a change of venue based on actual prejudice if voir dire of prospective jurors establishes that "there is such widespread and fixed prejudice within the jury pool that a fair trial in that venue would be impossible." *Id.* To prove reversible error occurred during voir dire, a defendant must demonstrate that the trial court did not excuse a juror who demonstrated actual prejudice. *State v. Romero*, 2019-NMSC-007, ¶ 10, 435 P.3d 1231.

**{31}** Defendant argues that the district court's denial of his motion for change of venue was an abuse of discretion because both presumed and actual prejudice were established. We disagree and explain.

### 1. Facts related to venue

**{32}** The day before trial, Defendant filed a motion for change of venue. The basis for the motion was a news story on KRQE and an online article released on the "eve of trial" that linked Defendant to both this case and the "Pokémon Go" murder. During argument on the motion, defense counsel explained that she also received an update from KOB on her cellphone that morning that said Defendant "[was] not just going to trial for this case, but he's been accused and charged in another killing." Defendant argued in the motion and before the court that the pretrial publicity "include[d] information regarding inadmissible evidence or prejudicial facts." Evidence of Defendant's involvement in the "Pokémon Go" murder had been ruled inadmissible.

**{33}** The district court judge acknowledged that the timing of the press coverage may be problematic but was not "unprecedented," deciding "to see if we can get a jury." The judge proposed requesting that the prospective jurors raise their hands if they had seen recent press coverage on this and the other case and conducting individual voir dire with those jurors. Both the State and Defendant agreed to the proposal. Only seven prospective jurors raised their hands when asked if they had seen relevant press coverage. None of the seven were empaneled on the jury.

**{34}** The district court judge never expressly ruled on the motion. Throughout trial, the judge instructed the jury not to look at relevant press coverage and confirmed that jurors had not seen ongoing coverage.

### 2. Analysis

**{35}** If the trial court determines there is no presumed prejudice and conducts voir dire, our review is limited to the determination of actual prejudice. *See Barrera*, 2001-NMSC-014, ¶ 16. That is because a finding of no actual prejudice after voir dire, if supported by substantial evidence, "necessarily precludes a finding of presumed prejudice." *Id.* It is within the trial court's discretion to wait until after voir dire to rule on a motion to change venue. *Id.* If the trial court empanels a jury after voir dire, we will conclude that the court implicitly determined that there was no actual prejudice. *State v. Gutierrez*, 2011-NMSC-024, ¶ 45, 150 N.M. 232, 258 P.3d 1024.

**{36}** In this case, the district court did not rule on Defendant's motion to change venue, but instead conducted voir dire and empaneled a jury. Thus, our review is limited to the district court's determination of actual prejudice. Defendant acknowledges this, but still argues that media coverage about the "Pokémon Go" and present cases was sensationalized and rife with propensity inferences, so presumed prejudice was established and not granting the motion was an abuse of discretion. We decline to address this argument in view of our established standard of review. *See Barrera*, 2001-NMSC-014, ¶ 16.

**{37}** Defendant next argues that "the court failed to exercise adequate caution" in empaneling a jury, so "failed to ensure the absence of actual prejudice derived from media exposure." However, Defendant does not point to a single empaneled juror who demonstrated actual prejudice. *See Romero*, 2019-NMSC-007, ¶ 10 (explaining that a defendant must demonstrate that the trial court did not excuse a juror who demonstrated actual prejudice to prove reversible error). As the record demonstrates, only seven prospective jurors raised their hands to acknowledge that they had seen recent, or any, relevant press coverage. None of the seven were empaneled on the jury. The district court did all that was required. *Cf. State v. Hernandez*, 1993-NMSC-007, ¶ 50, 115 N.M. 6, 846 P.2d 312 ("Our review of the record on appeal shows that, while many of the prospective jurors had read or heard about the case, all but a few could not remember what they had heard or read. Defendant was able to question these jurors and was able to challenge those who indicated partiality. We hold that Defendant has failed to meet his burden of proving that the trial court abused its discretion by failing to grant a motion for a change of venue."); *State v. Montoya*, 2005-NMCA-078, ¶¶ 16-17, 137 N.M. 713, 114 P.3d 393 (affirming the denial of a motion for change of venue, reasoning "the trial court conducted extensive individual voir dire and struck many members of the venire . . . Defendant does not show that there was any problem with any of the jurors seated for his trial").

**{38}** In sum, the district court did not abuse its discretion because its implicit conclusion that there was no actual prejudice is supported by substantial evidence. *See House*, 1999-NMSC-014, ¶ 32 (explaining that a district court does not abuse its discretion if its venue determination is supported by substantial evidence); *Gutierrez*, 2011-NMSC-024, ¶ 45 (explaining that if the trial court empanels a jury after voir dire, the court implicitly determined that there was no actual prejudice). The court empaneled a jury that did not include a single juror who had seen any press coverage about the "Pokémon Go" or present cases.

## III.    CONCLUSION

**{39}** Defendant's first-degree murder conviction is supported by sufficient evidence and the district court did not abuse its discretion in denying his motion for a change of venue. We therefore affirm Defendant's judgment and sentence and remand this matter to the district court.

**{40}    IT IS SO ORDERED.**

**DAVID K. THOMSON, Chief Justice**

**WE CONCUR:**

**MICHAEL E. VIGIL, Justice**

**C. SHANNON BACON, Justice**

**JULIE J. VARGAS, Justice**

**BRIANA H. ZAMORA, Justice**